No. 70–5379. RIDDELL *v.* RHAY, PENITENTIARY SUPERINTENDENT.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

Over the dissents of JUSTICES Black, BRENNAN, and MARSHALL, and myself, this Court last Term held that statements elicited in violation of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), may nevertheless be used to impeach the credibility of a defendant whose testimony in his own behalf is inconsistent with those statements. *Harris* v. *New York,* 401 U. S. 222 (1971). Denial of certiorari in this case illustrates the rewards that flow to those police interrogators who, deliberately or otherwise, ignore the restrictions placed upon them by *Miranda*—restrictions necessary to safeguard the privilege against self-incrimination and to insure the reliability of statements elicited in the police-dominated atmosphere of an incommunicado custodial interrogation.

Petitioner Riddell was convicted in state court of assault. The facts are undisputed. In the course of an argument over the conduct of a neighbor's dog, a rifle carried by Mr. Riddell discharged, the bullet striking his neighbor in the foot. The only real issue at trial was that of intent. Testifying in his own defense, Mr. Riddell said he did not intend that the rifle go off, and did not have his finger on the trigger when it fired. On cross-examination, however, the prosecution was permitted to confront Mr. Riddell with a statement elicited from him, in violation of *Miranda,* in which he told the police "I cocked the hammer and pulled the trigger. I thought the rifle was aimed towards the ground and only intended to scare Mr. Lewis." This statement was virtually a direct admission of the only element of the offense at issue; and though it was introduced for the

"limited purpose" of "impeachment," it was certain to have a prejudicial, if not conclusive, effect on the jury.

The possibility of using illegally obtained incriminating statements at trial, for any purpose, raises grave questions concerning police noncompliance with *Miranda.* It is undeniable that *Miranda* was predicated in part upon a deep concern for discouraging coercive police practices. Eleven pages of the opinion are devoted to an examination of police interrogation procedures. They compel the conclusion that

> "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U. S., at 467.

It is, of course, just this kind of testimonial compulsion that the Fifth Amendment, made applicable to the States by the Fourteenth, proscribes.

There is widespread agreement that police interrogation procedures are sensitive to the mandates of the courts:

> "[T]he predominant incentive for interrogation is to obtain evidence for use in court. Consequently, police conduct in this area is likely to be responsive to judicial rules governing the admissibility of that evidence. 'There can be no doubt,' the President's Crime Commission reported, that the Supreme Court's rulings about interrogation procedures 'had much to do with the fact that today the third degree is almost nonexistent.' "

Oaks, Studying The Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 722 (1970). See also J. Wilson, Varieties of Police Behavior (1968). Thus, to the extent that the use of incriminating statements elic-

ited in violation of constitutional safeguards is prohibited, the police have no incentive to attempt to circumvent those safeguards.

There is the view that the use of *Miranda*-violative statements does not affect the "fundamental fairness" of the courtroom trial.* I cannot accept this position. The lesson of *Miranda* is that the effective determination of guilt all too often rests on the ruses and stratagems employed in an incommunicado police interrogation, not on the evidence and testimony elicited in the impartial surroundings of a trial court.

Yet, after *Harris,* there is no longer any real incentive for police to obey *Miranda.* Credibility is always an issue when an accused takes the stand in his own defense. The license granted by the *Harris* majority to use *Miranda*-violative statements for impeachment purposes, therefore, foreshadows the possible use of tainted statements in almost every case. This opens the door to a calculated risk by police interrogators. If, in response to *Miranda* warnings, an accused indicates he wishes to have an attorney present during questioning, the request may be ignored with virtual impunity. If a damaging statement is thereafter forthcoming, it may almost certainly be used against the accused if he later elects to take the stand in his own defense. Moreover, the risk

---

*This view is reflected in draft legislation recently submitted by the Justice Department to the Senate Subcommittee on Constitutional Rights. The proposed legislation would restrict federal habeas corpus relief to constitutional rights which have as their "primary purpose the protection of the reliability of either the factfinding process at the trial or the appellate process on appeal from the judgment of conviction." Habeas Corpus Amendments of the Department of Justice, Letter to Hon. Sam J. Ervin, Jr., Oct. 19, 1971, Appendix ii. The covering letter expressly refers to the use of *Miranda*-violative statements as a claim which would be barred under the proposed amendments. Letter 16. But see Dershowitz & Ely, *Harris* v. *New York,* 80 Yale L. J. 1198 (1971).

is minimal that the inability to use the statement in the prosecution's case in chief will result in a dismissal of the charges or a directed verdict of acquittal. Unlike other situations in which exclusionary rules operate to exclude illegally obtained physical evidence, it is seldom that a prima facie case requires corroboration from the lips of the accused.

The accused may take cold comfort in the fact that if he does take the stand, the tainted statements may only be used for "impeachment." We have often noted the impossible task that faces a jury instructed to close its eyes to the fact that evidence introduced for a limited purpose is highly damaging on the ultimate issue of guilt as well. "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch* v. *United States,* 336 U. S. 440, 453 (Jackson, J., concurring). See also *Spencer* v. *Texas,* 385 U. S. 554, 575 (opinion of Warren, C. J.). Cf. *Bruton* v. *United States,* 391 U. S. 123; *Jackson* v. *Denno,* 378 U. S. 368.

It is no answer to say, as did the majority in *Harris,* that the privilege against self-incrimination "cannot be construed to include the right to commit perjury." 401 U. S., at 225. As we said in *Miranda,* the presence of counsel during police questioning may help "to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial." 384 U. S., at 470. A statement made in the inherently coercive, police-dominated atmosphere denounced in *Miranda* is not so reliable that we can safely ignore its implicit involuntariness and the critical burden the use of such a statement places upon the exercise of the Fifth Amendment privilege.

The exclusionary rule is a recognition that the vision of law enforcement authorities is often narrowed by

their total immersion in the never-ending war against crime. If we permit the legitimate desire to win that war to undermine constitutional guarantees of liberty, our victory will indeed be fleeting. I would grant this petition.