## Commonwealth, Appellant, *v.* Horner.

Argued January 8, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*A. Makadon,* Assistant District Attorney, with him *Mark Sendrow* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*John W. Packel,* Assistant Defender, with him *Jonathan Miller,* Assistant Defender, and *Vincent J. Ziccardi,* Defender, for appellee.

OPINION BY MR. JUSTICE EAGEN, September 19, 1973:

On September 12, 1962, Felix Wade Horner was convicted by a jury of murder in the first degree and the punishment was fixed at life imprisonment.[1] No posttrial motions were filed and the court imposed sentence as the jury directed. No appeal was entered from the judgment.

On February 13, 1969, Horner filed a petition seeking post-conviction relief under the provisions of the Act of January 25, 1966, P. L. (1965) 1580, 19 P.S. §§1180-1 et seq. After an evidentiary hearing, the trial court found Horner's right to appeal as mandated by *Douglas v. California,* 372 U.S. 353, 83 S. Ct. 814

---

[1] On October 3, 1961, Horner pleaded guilty to murder generally and, after an evidentiary hearing, was adjudged guilty of murder in the first degree and sentenced to death. However, he was later permitted to withdraw the guilty plea and the sentence was vacated.

(1963), had been violated and granted him permission to file post-trial motions "nunc pro tunc." Such motions were filed and subsequently a court en banc by a vote of two to one granted Horner a new trial. The Commonwealth filed this appeal challenging the correctness of that order.[2]

The relevant facts may be summarized as follows:

On December 18, 1959, two police officers, acting pursuant to an anonymous phone call, went to the residence of a Mr. and Mrs. Donald Newman in Philadelphia and discovered the dead body of Mr. Newman buried under earth in the basement. A medical examination disclosed death was caused by a gunshot wound of the thorax.

Later the same day, Horner and Mrs. Newman were taken into police custody in Harrisburg, Pennsylvania, and following questioning Horner made a statement, which was recorded, wherein he admitted shooting Newman, but stated he acted in self-defense. Horner completely absolved Mrs. Newman of any complicity. Prior to making the above statement, Horner was advised that anything he said could be used against him in court, but he was not advised he could have the assistance of counsel during the questioning.

On December 19, 1959, Horner was given a preliminary hearing before a committing magistrate. He was not represented by counsel, nor was he advised he could have such assistance. At this hearing the district attorney called Horner as a Commonwealth witness and, after warning him that he did not have to testify and anything he said could be used against him in the event he was held for trial, asked Horner to "tell us what happened." "Do you understand the warning?" After Horner indicated he understood the warning, the dis-

---

[2] Since the order complained of was based on pure questions of law, the Commonwealth may appeal. Cf. *Commonwealth v. Wrona*, 442 Pa. 201, 275 A. 2d 78 (1971).

trict attorney again asked, "Do you want to tell us what happened? Tell us what happened?" Horner's testimony was consistent with his statement given to the police the day before. During his testimony, Horner was asked specific questions by the district attorney about his relationship and conduct with Mrs. Newman and the events leading up to the killing. He was also asked about the truthfulness and voluntariness of the statement he made to the police. Horner admitted the voluntariness of the statement and affirmed its truthfulness. At the conclusion of the hearing, Horner was committed to jail to await action by the grand jury.

In the days that immediately followed, the police continued to question Horner and told him Mrs. Newman had changed her story. On December 23, 1959, Horner was again questioned by a police detective and confronted with a written statement given the police by Mrs. Newman. In this statement Mrs. Newman said she and Horner plotted her husband's death for a month, and Horner shot her husband as he lay asleep in bed. Horner then admitted Mrs. Newman's statement was true and he signed it.

At trial, Mrs. Newman testified as a Commonwealth witness,[3] and her testimony was consistent with the statement she had previously given the police, namely, that she had been romantically involved with Horner, and the two plotted Mr. Newman's death and Horner shot the victim while he was asleep in bed.

Testifying on his own behalf, Horner admitted his romantic relationship with Mrs. Newman while Newman was alive and having discussions with her about killing her husband. He also admitted securing the

---

[3] Prior to Horner's trial, Mrs. Newman plead guilty to an indictment charging her with her husband's murder. She was adjudged guilty of murder in the first degree and sentenced to life imprisonment.

gun which was eventually used. However, he stated he gave the gun to Mrs. Newman and she did the shooting in a second floor bedroom while he was in the living room on the first floor. He admitted helping conceal the body following the shooting and traveling with Mrs. Newman to Harrisburg immediately thereafter.

On cross-examination the district attorney, without objection, asked Horner, in part, if he remembered his testimony at the preliminary hearing before the committing magistrate on December 19, 1959, and if at that hearing Horner did not testify under oath he shot Newman.[4] Horner admitted he so testified at that time, but said it was "to protect Evelyn [Mrs. Newman]".

A majority of the court en banc below ruled this use at trial of Horner's testimony at the preliminary hearing when he was without counsel and not informed he could have such assistance was prejudicial error which required a new trial.[5] We reluctantly agree.

The issue is controlled by *White v. Maryland*, 373 U.S. 59, 83 S. Ct. 1050 (1963).[6] See also *Arsenault v. Massachusetts*, 393 U.S. 5, 89 S. Ct. 35 (1968).

---

[4] The district attorney's questions during this phase of the cross-examination emphasized Horner had sworn on "The Holy Bible" at the preliminary hearing to tell the truth and nothing but the truth.

[5] The court also ruled it was reversible error for the trial court to deny a specific request to instruct the jury that it must determine the voluntariness of Horner's statement to the police and his subsequent adoption of Mrs. Newman's statement to the police. In view of our disposition of the principal issue, it is unnecessary for us to reach the correctness of this ruling.

[6] In *White*, petitioner entered a guilty plea at his preliminary hearing without counsel being present. Following the hearing, White obtained counsel, withdrew his plea, and went to trial. Since the prior uncounseled guilty plea was introduced into evidence at trial, the Supreme Court held that White's preliminary hearing constituted a critical stage in the proceedings requiring assistance of counsel. Accordingly, petitioner was granted a new trial at which the withdrawn guilty plea was not to be used against him.

Citing *Coleman v. Alabama,* 399 U.S. 1, 90 S. Ct. 1999 (1970), *Adams v. Illinois,* 405 U.S. 278, 92 S. Ct. 916 (1972), and *Commonwealth v. James,* 440 Pa. 205, 269 A. 2d 898 (1970), the Commonwealth argues the ruling in *White v. Maryland,* supra, need not be applied retroactively. These decisions are inapposite. Herein, unlike in *Coleman, Adams* and *James,* the preliminary hearing was a critical stage in the prosecution proceedings where the assistance of counsel was required. Under such circumstances, *White v. Maryland,* supra, is retroactive. See *Adams v. Illinois,* supra, and *Commonwealth ex rel. Firmstone v. Myers,* 431 Pa. 628, 246 A. 2d 371 (1968).

The Commonwealth argues the preliminary hearing instantly may not be considered a critical stage in the prosecution proceedings, because as distinguished from *White* and *Arsenault,* it did not involve the entry of a guilty plea. Accepting that the use of the entry of a guilty plea at a preliminary hearing is not the same as utilizing the testimony of the accused that he shot and killed a person in self-defense, nonetheless, prejudice did result to Horner by the trial use of his testimony at the preliminary hearing, and this prejudice renders the preliminary hearing a "critical stage." Cf. *Commonwealth ex rel. Firmstone v. Myers,* supra, and *Commonwealth ex rel. Parker v. Myers,* 414 Pa. 427, 200 A. 2d 770 (1964).

Finally, the Commonwealth urges *Harris v. New York,* 401 U.S. 222, 91 S. Ct. 643 (1971), requires the conclusion that the use at trial of Horner's testimony at the preliminary hearing to impeach his credibility was proper.[7] However, *Harris* concerned the use of a

---

[7] The decision in *Harris v. New York* has been criticized as undercutting *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966). See 85 Harv. L. Rev. 44-53 (1971). Additionally, some jurisdictions have refused to follow the ruling in *Harris.* See *State v. Santiago,* 53 Haw. 254, 263, 492 P. 2d 657, 662 (Hawaii Supreme Court 1971); *People v. Taylor,* 104 Cal. Rptr. 350, 501 P. 2d 918 (1972).

pretrial statement by the accused not meeting *Miranda* standards on cross-examination to impeach the defendant's credibility. Here, we are faced with the use of pretrial testimony given under oath. We agree with the court en banc below that the two situations are vitally different. In this connection, the court said: "The adverse use of testimony given by defendant at a preliminary hearing without advice of counsel is far more prejudicial to him than the use of a statement given to the police without the required Miranda warnings because that testimony is given under oath in open court before an impartial magistrate rather than at a police station to a policeman interested in gathering evidence and without an oath. A statement given to the police is more vulnerable to attack as made under duress or from fear and without full knowledge and understanding of an individual's constitutional rights than testimony given at a public preliminary hearing. A jury is more likely to believe that the individual's will was overborne by the interrogation of police officers than by questioning of a district attorney governed by the rules of evidence. Consequently, the use of such testimony on cross-examination has a significantly greater impact than a similar use of an incriminating statement. The impact distinguishes the use, on cross-examination, of testimony given at an uncounseled preliminary hearing from the similar use permitted by Harris, of an incriminating statement taken without the required Miranda warnings."

Order affirmed.

Mr. Justice NIX concurs in the result.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I readily concur in the majority's decision today holding that the use, at trial, of appellant's "testimony at the preliminary hearing when he was without counsel and not informed he could have such assistance [is]

prejudicial error which require[s] a new trial." As the majority acknowledges, the issue is clearly controlled by *White v. Maryland,* 373 U.S. 59, 83 S. Ct. 1050 (1963).

Had the majority of this Court recognized the import and efficacy of *White v. Maryland,* supra, earlier, other litigants would have received the relief to which they were constitutionally entitled. See, e.g., *Commonwealth v. Dickerson,* 428 Pa. 564, 565, 237 A. 2d 229, 230 (1968) (dissenting opinion).

I note that while I agree with the majority that *Harris v. New York,* 401 U.S. 222, 91 S. Ct. 643 (1971), is not applicable in the present circumstances, this Court has never approved of or adopted the controversial holding of *Harris.* Indeed, the law of this jurisdiction since at least 1968 has been that "a statement procured either after failure to give an accused opportunity to consult with counsel or . . . failure to warn an accused of his right to remain silent (under *Escobedo*), or in the absence of police attempts to advise the accused of his constitutional rights (under *Miranda*) *cannot be employed at trial for any purpose . . . even for purposes of impeachment." Commonwealth v. Padgett,* 428 Pa. 229, 231-32, 237 A. 2d 209, 210 (1968) (emphasis added).

Mr. Justice MANDERINO joins in this concurring opinion.

———

DISSENTING OPINION BY MR. JUSTICE POMEROY:

Being convinced that the trial court erred in the two grounds on which appellee was awarded a new trial, I must dissent from the affirmance of its order.

## I.

The issue considered by the Court in its opinion is whether a statement given by the defendant at an uncounseled preliminary hearing in 1959 could be used

against him by way of impeachment at his trial which took place in 1962. The Court holds that this question is controlled by *White v. Maryland,* 373 U.S.. 59, 10 L. Ed. 2d 193 (1963), and states that the use of such a statement at trial "was prejudicial error which required a new trial."[1] I cannot agree with that conclusion.

*White* arose under a Maryland procedure which permitted (but did not require) the defendant at a preliminary hearing to enter a plea to the charges against him. In that case the defendant, uncounseled, entered a plea of guilty and later, counseled, withdrew the plea, entered a plea of not guilty, and proceeded to trial, only to be impeached by his uncounseled guilty plea at the preliminary hearing. The Supreme Court of the United States, citing *Hamilton v. Alabama,* 368 U.S. 52, 55, 7 L. Ed. 2d 114, 117 (1961), held that "only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." Notwithstanding the *White* and *Hamilton* decisions, however, until *Coleman v. Alabama,* 399 U.S. 1, 26 L. Ed. 2d 387 (1970), it was the law that as a *general* proposition the presence of counsel at a preliming hearing (one at which pleas were not taken—*White v. Maryland;* one at which defenses not then raised were not lost—*Hamilton v. Alabama*) was not constitutionally required. *Coleman,* of course, overruled that general proposition and held that (1) an Alabama preliminary hearing was a "critical stage" of a criminal prosecution at which the presence of counsel is constitutionally mandated; and that (2) the petitioner in *Coleman* was entitled to a remand to determine if the absence of counsel had in some manner prejudiced him, or whether, instead, it was constitutionally harmless error. As the

---

[1] It is clear that the decision in *White v. Maryland,* supra, is to be retrospectively applied. *Arsenault v. Massachusetts,* 393 U.S. 5, 21 L. Ed. 2d 5 (1968).

majority indicates, *Coleman* was held in *Adams v. Illinois*, 405 U.S. 278, 31 L. Ed. 2d 202 (1972), to apply prospectively only, that is to say, to preliminary hearings conducted after June 22, 1970.[2]

We are thus faced with two lines of authority. If in the instant case appellee's claim to counsel falls within *Hamilton v. Alabama*, supra, or *White v. Maryland*, supra, then *without a showing of prejudice* he is entitled to a new trial;[3] but if *Hamilton* or *White* are not applicable to appellee's situation, then *Coleman* is the governing authority. If the latter is the case, then, as this preliminary hearing precedes the date of that decision, appellant's claim to assistance of counsel will fail, *Coleman* not being retroactively applied.[4] Clearly, as

---

[2] The preliminary hearing in the case at bar was held on December 19, 1959.

[3] *White v. Maryland*, 373 U.S. at 60: "We repeat what we said in Hamilton v. Alabama . . . that we do not stop to determine whether prejudice resulted: 'Only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently.'"

[4] Appellee advances an intermediate position, said to be the established law of this Commonwealth. He argues that if it can be shown that the absence of counsel at the preliminary stage operated to his prejudice at a later stage, then a constitutional right to counsel has been denied, citing cases such as *Commonwealth v. Stukes*, 435 Pa. 535, 257 A. 2d 828 (1969) ; *Commonwealth ex rel. Firmstone v. Myers*, 431 Pa. 628, 246 A. 2d 371 (1968) ; *Commonwealth ex rel. Mount v. Rundle*, 425 Pa. 312, 228 A. 2d 640 (1967) ; *Commonwealth ex rel. Knowles v. Rundle*, 419 Pa. 300, 213 A. 2d 635 (1965) ; *Commonwealth ex rel. James v. Russell*, 416 Pa. 546, 207 A. 2d 792 (1965) ; *Commonwealth ex rel. Butler v. Rundle*, 416 Pa. 321, 206 A. 2d 283 (1965).

My examination of those cases discloses that they do no more than recognize the authority of *White v. Maryland* and *Hamilton v. Alabama*, all the while reciting the then general rule that there is no constitutional right to counsel at a preliminary hearing.

The holding of *Coleman v. Alabama*, set forth in the text above, is that a preliminary hearing (Alabama's is indistinguishable from Pennsylvania's) is a "critical stage" in criminal prosecution and

it seems to me, Horner's position is not that in *Hamilton*, since under our practice no defenses could be waived by a failure to raise them at the preliminary hearing.[5] Similarly, Horner's claim is not that in *White v. Maryland*, Horner not having pleaded guilty at the preliminary hearing.

Indeed, what the appellee here did at the preliminary hearing runs in the opposite direction to what occurred in *White* or *Hamilton*. Rather than waive defenses, he selected one—self-defense—and testified to that effect *only after having been first warned that he was not required to say anything and that what he did say might be held against him*. Rather than confess guilt, Horner *professed innocence* by explaining that the killing was *justifiable homicide*, that is to say, not a crime at all. I therefore think that Horner's claim to counsel is not that in either *White* or *Hamilton* and that the nonretroactivity of *Coleman v. Alabama* leads to the conclusion that at the date of this preliminary hearing (1959), Horner had no constitutional right to

that defendants who were without counsel in preliminary hearings conducted after June 22, 1970 *and* who were prejudiced thereby (i.e., not harmless error) are entitled to new trials. The intermediate rule advanced by appellee and, it would seem, implicitly adopted by the majority is merely the holding of *Coleman* retroactively applied, notwithstanding that such retroactive application is not required, see *Adams v. Illinois*, cited in text, supra.

[5] It could be argued that by testifying to a version of the facts amounting to a claim of self-defense, appellee precluded himself from later asserting a different defense. *Hamilton*, however, was a recognition that the indigent layman is in danger at a preliminary hearing of waiving defenses (under an Alabama law which at the time provided for such preclusion) by his failure to recognize that the facts as he knows them constitute a defense. Here, however, Horner recognized that his version of the facts did constitute a defense. He was not precluded *by Pennsylvania procedure* from later asserting a different defense at trial. The only penalty would be that which always arises when one decides to change one's story.

counsel. The rationale by which the majority reaches a contrary result, is, at least to me, most unclear.[6]

Immediately upon being arrested by the police (at a date pre-*Escobedo* and pre-*Miranda*), appellee gave and signed a statement admitting the killing, but asserting self-defense. At no point, either pre-trial, at trial, or post-trial, has any suggestion been made that this first statement was in some manner inadmissible. Indeed, it was introduced without objection at the trial during the Commonwealth's case-in-chief. When at trial defendant Horner took the stand and denied having killed the deceased, justifiably or otherwise, it was open to the Commonwealth to impeach him, using either this first statement, already introduced into evidence, or using the transcripts from the preliminary hearing. The Commonwealth chose the latter, evidently because it was given under oath before a judicial officer and was quite understandably more effective a tool for the Commonwealth's purpose.[7] Unlike the majority, I see no "prejudice" in this procedure other than the common garden variety that comes from switching in mid-stream from a claim of self-defense to a claim of not having killed

---

[6] The majority distinguishes *Coleman v. Alabama* from this case as follows: "Herein, unlike in Coleman . . . , the preliminary hearing was a critical stage in the prosecution proceedings where the assistance of counsel was required."

With all respect, *Coleman* cannot be distinguished on the ground that it did not involve a "critical stage". Witness the following excerpt from the opinion of Mr. Justice BRENNAN, speaking for the Court: "The inability of the indigent accused on his own to realize these advantages of a lawyer's assistance compels the conclusion that *the Alabama preliminary hearing is a 'critical stage'* of the State's criminal process at which the accused is 'as much entitled to such aid [of counsel] . . . as at the trial itself.'" 399 U.S. at 9-10 (emphasis added).

[7] I see no necessity for deciding or discussing the applicability of *Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1 (1971), to this situation, assuming, of course, a denial of a constitutional right to counsel not present in this case.

at all.[8] Appellee, however, was not constitutionally entitled to counsel at the preliminary hearing under *Coleman v. Alabama,* was not entitled to counsel under the decisions in *White v. Maryland* and *Hamilton v. Alabama,* and therefore the damage to his defense was only that generally caused by the giving of inconsistent statements under oath.

## II.

The lower court granted appellee a new trial on another ground, not considered in the opinion of the Court: the refusal of the trial judge to give the jury a requested instruction to the effect that the jury must first determine the voluntariness of Horner's third statement and only if so determined should it be regarded as evidence.[9] This statement was introduced as part of

---

[8] One might ask whether an attorney would have altered the stance the defendant took at the preliminary hearing. Horner had already given a signed statement to Philadelphia police in which he asserted self-defense. Mrs. Newman's story was consistent with that claim. It having been thus asserted in a signed statement, a competent attorney might well have advised Horner to continue his self-defense claim at the preliminary hearing.

The reason Horner was obliged to abandon self-defense at trial was that after the preliminary hearing, the wife (Mrs. Newman) changed her story to one of conspiracy to murder with Horner as the killer, and then pleaded guilty to murder. No jury would believe self-defense when the paramour had acknowledged guilt. The prejudice arises logically not from the absence of counsel, but rather from the refusal of the wife to remain constant in her earlier account of the killing. For the inconstancy of accomplices the law provides no remedy.

[9] The third statement was actually that of the paramour-wife, who admitted participation in a conspiracy to murder her husband and stated that Horner had done the actual shooting. Horner, during an interview with the Assistant District Attorney after the date of the preliminary hearing, had agreed that this statement was the truth and had signed it. The Commonwealth introduced it as an adoptive admission.

the Commonwealth's case without defense objection. During Horner's direct testimony, defense counsel touched upon the "voluntariness" of this ratified statement only to this extent: "[Defense Counsel] Q. Did you finally sign that statement? A. Yes, I finally signed it so he would quit asking me so many questions. As I started to say, I didn't think it was any good and I hadn't a chance to see an attorney. In fact, it was ten months before I had an attorney." There was no evidence of physical coercion; there was no evidence of the use of impermissible interrogation techniques by the questioner, an attorney. There is only this assertion that "I finally signed it so he would quit asking me so many questions."

While the right which appellee asserts to this instruction is not of *constitutional* dimension,[10] there is no question but that such an instruction is part of our State's law. See, e.g., *Commonwealth v. Heckathorn,* 429 Pa. 534, 241 A. 2d 97 (1968); *Commonwealth ex rel. Gaito v. Maroney,* 416 Pa. 199, 204 A. 2d 758 (1964); *Commonwealth v. McLean,* 213 Pa. Superior Ct. 297, 247 A. 2d 640 (1968). Although the trial court was in error in refusing the request, that error was in my opinion harmless and not cause for a new trial.

The jury here was properly instructed on its fact-finding role. It was told that the weight to be given to the evidence admitted in the case was for its determination and that in deciding what credit to give to certain statements, it should place the statement in the context in which it was given. The jury was confronted with three contradictory accounts of the killing: first, Horner's account in his first statement and at the preliminary hearing (self-defense; no conspiracy); second,

---

[10] In *Lego v. Twomey,* 404 U.S. 477, 30 L. Ed. 2d 618 (1972), the United States Supreme Court held that a criminal defendant was not entitled under the federal constitution to have a second determination of voluntariness made by the jury.

that of Mrs. Newman both in a signed statement (adopted by Horner) and restated at trial (conspiracy to murder; Horner the killer) ; and finally, that of Horner at trial (Mrs. Newman shot her husband; no conspiracy). Faced with these irreconcilable conflicts, the jury obviously had to resolve credibility problems, a task for which it was adequately instructed. There is no reason to suppose that in so doing the jury would not have remembered Horner's reason for adopting the account of Mrs. Newman ("I . . . signed it so he would quit asking me so many questions.") or that the jury would not give proper weight to that assertion in resolving the credibility problem.[11]

I would reverse and remand with directions that the lower court pass on the four allegations of error not dealt with in the opinion and order granting the appellee a new trial.

Mr. Chief Justice JONES joins in this dissenting opinion.

---

[11] I note that the notes of testimony from Horner's PCHA petition (on which he was granted a direct appeal *nunc pro tunc*) have not been transcribed. The Assistant District Attorney who represented the Commonwealth at that PCHA hearing stated in a brief filed below in opposition to post-trial motions that "[a]t defendant's post-conviction hearing on May 20, 1970, Charles L. Guerin, Esquire, testified that he and Judge Meade [who together were defense counsel at Horner's trial] did not object to the admission of the statements because they concluded that defendant gave the statements voluntarily." If that is so, I would be doubly certain that the voluntariness issue does not warrant a new trial.