## 27968. CAMPBELL v. THE STATE.

ARGUED JUNE 11, 1973 — DECIDED SEPTEMBER 5, 1973 — REHEARING DENIED SEPTEMBER 19, 1973.

*F. Robert Raley,* for appellant.

*Fred M. Hasty, District Attorney, Walker P. Johnson, Jr., Stephen Pace, Jr., Arthur K. Bolton, Attorney General, Courtney Wilder Stanton, William F. Bartee, Jr., Assistant Attorneys General,* for appellee.

GRICE, Presiding Justice. This appeal by Robert Campbell, Jr. is from the judgment of conviction for murder and rape and from the imposition of sentences of life imprisonment and four years confinement therefor. He was indicted by the Grand Jury of Bibb County and was tried together for both offenses for the murder of William Cross and the rape of a named female. Separate motions for new trial were filed and overruled. His consolidated appeal involves 21 enumerations of error.

The evidence adduced upon the trial, was, insofar as we deem necessary for purposes of review, that which follows.

James Bryson Dawson, a representative of the State Crime

Laboratory, testified insofar as necessary to recite here, that a .32 caliber lead bullet which was established to be the murder bullet was fired from the .32 caliber pistol found in the deceased Cross' car; that he had examined a sheet and found that it had on it several medium brown and light brown Caucasian hairs, but that none having Negroid characteristics was found. The evidence was that Cross was a Caucasian and the appellant is a Negro.

Donald F. Arnett, a criminal investigator from the Bibb County Sheriff's office, testified essentially that he found the alleged rape victim's torn panties on the floor in the bedroom occupied by the appellant; that he also found the sheet in the same bedroom to contain hairs described by the witness Dawson; that he saw her at the hospital at about 3:45 that morning; that she had been crying a lot; that he saw blood on her nightgown; that he questioned the appellant and noted he had been drinking, "but he was not inebriated"; that he observed scratch marks on his neck and on his side and bruises on his body; that he noticed that the deceased Cross had "no fingernails at all" because they had been bitten or cut off at the quick; and that upon request the appellant gave him a urine specimen which he delivered to a state medical examiner.

Lieutenant Jerry Modena of the Bibb County Sheriff's Department interviewed the appellant after he brought Cross to the hospital and detected a strong odor of alcohol, but the appellant did not appear to be drunk. He advised him of his Miranda rights and the appellant gave him a statement which in pertinent part was as follows: that Cross told him "somebody was messing around his house and gave me his pistol"; that he and Cross went around different sides of the house; that shortly thereafter he saw someone running; that he shot one time; that he went to the other side of the house and found that it was Cross; and that they put him in the car and brought him to the hospital. In his statement to Modena the appellant claimed that both he and the deceased had been drinking and that the appellant was so "high" he could hardly stand up. Modena also said he noticed scratches on the appellant and that the pistol was removed from the car.

Dr. Leonard Campbell, a physician and state medical examiner, testified that Cross' death was caused by a gunshot wound in the back of the head; that a urine specimen from the appellant contained sperm; that there were scratches over the appellant's back and several bruises on his cheek, chest and shoulders; that the examination of the alleged rape victim revealed that there were no significant bruises on her body; that her genitalia had not

been recently hurt from any trauma; that a vaginal smear taken revealed spermatozoa; that there was no indication that she had been forced into intercourse with anyone, because there were no bruises and the vagina was patent.

Henry Castleman, a Macon police officer, swore in summary that he was called to a hospital to pick up a prisoner and while there he heard a nurse shout that somebody had been shot; that he ran out of the front door and saw the car carrying the appellant, the deceased and the alleged rape victim; that he sent them to the emergency room entrance; that he drove the police car there and helped them unload Cross from the car. He also stated that the alleged rape victim was in a very hysterical state but attempted to provide information about what had transpired. She stated in the presence of the appellant that he had raped her and "If my fiance dies, I want him to die." The witness searched the appellant for weapons and found a holster in his pocket with a shotgun shell inside it. He later looked in the deceased's car and saw the revolver on the floor.

The alleged rape victim gave testimony which was in essential part that which follows:

On April 22, 1972, Cross and the appellant were engaged in painting a house where she and Cross planned to live after their marriage.

At approximately eleven o'clock that evening, when she and Cross were occupying one of the bedrooms of the house, she heard a noise. The appellant knocked on the bedroom door and stated that he thought he heard a prowler outside. Thereupon Cross picked up a shotgun and told her that he and the appellant were going outside and for her to lock the door and stay inside.

She testified that the appellant went out of the back door and Cross followed him. She believed that Cross had the shotgun then but was not certain whether the appellant had a weapon at that time. However, one of them had a flashlight. She remembered that Cross said something about going around one side of the house, that the appellant went around the other side and that she stood at her bedroom window and watched. She saw the two men meet from opposite directions near her window, seeing them plainly from a light in the yard. One of the men shined a flashlight toward the side of the house and called out, "Anybody in there, come out," or words to that effect. Finding no one there, the two men started back toward the house with Cross two or three feet in front of the appellant. She left the window and within a few seconds a shot rang

out. She ran back to the bedroom window and saw Cross lying face down on the ground. She knew he had been shot and ran to the back door.

The appellant was there and grabbed her arm. She said, "Bill's been shot. I've got to get out to him." The appellant answered, "No, he's o.k.," she said, "Robert, he's been shot. I saw him." Again the appellant said, "No, he's o.k.," and stopped her from going out to where Cross was lying. She remembered seeing the pistol then in the appellant's hand.

The appellant pushed her into the bedroom which he had occupied. She tried to get away but the appellant would not let her go and pushed her across the bed in that room. She fought, screamed, and told him that she had to go to Cross. During this time she was kicking and trying to claw and bite him. She continued telling him that Cross was his friend and that they had to get him to the hospital.

She testified further that he was still grabbing for her panties and finally ripped them off. At one time she had difficulty in breathing because he had his hands over her face. He told her if she didn't stop screaming he would shoot her. After that, he allowed her to get up but he still held her by the arm. She told him that they had to help Cross.

She then broke away and hurried to Cross. He was bleeding but his heart was still beating as he gasped for breath. She told the appellant that he had to help her get Cross to the hospital. She attempted to pick him up but was unsuccessful. The appellant finally began to help her. She got the keys to Cross' car from the inside of the house and started it to warm the motor. However, the appellant removed the key from the ignition.

When the two of them were finally able to get Cross into his car, she told the appellant that she would drive to the hospital because she knew the way. The appellant said he would drive and she got in the back seat and held Cross' head up. He said, "We'll say it was a prowler," or words to that effect. She agreed with him, hoping that he would think that she did not believe that he had shot Cross. The appellant then showed her the gun and told her three bullets were still in it.

They then started for the hospital. She urged him to drive faster but he replied that the car needed gas. She first argued with him but then told him to stop at the service station which they were approaching and to tell the attendants to hurry, that a man had been shot. After getting the gasoline, they had difficulty in locating

the hospital. Someone finally directed them to go to "Pine Street."

Upon arriving at the hospital, a police officer came to the car, and told them to go to the back entrance. At first they were unable to locate it but an officer in a police car told the appellant to follow him. There hospital attendants placed Cross on a stretcher and took him into the hospital. At this point she told a police officer, "Don't let that boy go out there," that he had shot Cross; that he had raped her and that he had a gun. Cross died shortly thereafter.

The alleged rape victim also testified that she believed the appellant had reached a climax; that she and Cross had not had sexual intercourse since her last menstrual period on April 9; that she became pregnant from what happened and later had a legal abortion performed at Grady Hospital in Atlanta.

The appellant made an unsworn statement essentially as follows: that he helped Cross in painting his house; that Cross came into the appellant's bedroom, saying that someone was outside; that Cross handed him a pistol and told him to go outside with him; that they then separated and went around the house; that he saw someone running and shot one time; that he went around the other side and saw Cross; that he started picking him up; that the alleged rape victim began pouncing on him and scratching him; that both of them got the deceased into the car; that they drove toward the hospital and stopped to purchase gasoline; and that they arrived at the hospital and were directed to the other side by an officer.

Dr. Stephen Richard Goldman testified for the state, and his testimony will be referred to later.

The witness Arnett then testified for the state in substance as follows: that the appellant had previously stated to him that he saw or thought he saw, a prowler running; that he fired a shot, and that "when he saw it was Bill, he panicked, and didn't remember anything after that," until driving the car and stopping for gasoline.

■ We have no difficulty in concluding that the jury's verdicts of murder and rape were amply supported by the evidence.

As to murder, the element of intent to kill is shown by the alleged rape victim's testimony that she saw the appellant walking two or three feet behind Cross; that seconds later she heard a shot; that within two or three seconds she saw Cross lying on the ground; and that she knew he had been shot. Under the circumstances here the law presumes an intent to kill. From all of the evidence the jury was authorized to find that the appellant pretended that a prowler was lurking around the house and thereby lured Cross into a

position where he could shoot him.

Insofar as the rape charge is concerned, the victim's testimony was sufficient in every essential. This was corroborated by her complaint made to the first officer she encountered at the hospital, the finding of her torn panties on the floor of appellant's bedroom, fingernail scratches by her upon him, Caucasian body hairs on the sheet of his bed, the vaginal smear from her showing sperm, and his urine test revealing spermatozoa. Dr. Campbell's testimony to the effect that there was no indication that she had been forced into intercourse was merely negative evidence on the issue of force. Where, as here, there is corroborating evidence, and the jury has resolved that issue, this court will not pass upon its probative value. *Hogan v. State,* 221 Ga. 9 (2) (142 SE2d 778); *Morgan v. State,* 229 Ga. 532 (1) (192 SE2d 338).

The ruling made here disposes of Enumeration of Error 1, as to the general grounds of the motion for new trial. It also disposes of Enumerations of Error 2, 3, and 4, asserting the general grounds, and Enumeration of Error 8, the failure to grant appellant's motion for verdict of acquittal.

■ The appellant also contends that the trial court erred in failing and refusing to grant him a continuance upon his oral motion prior to the trial for the purpose of further psychiatric evaluation before completion of his case. This is expressly urged in Enumeration of Error 5. It is also included in Enumeration 1 which complains of the overruling of his motion for new trial, since it is one of the grounds of the motion.

This contention, as we appraise it in the light of the record, cannot be sustained.

At the outset it should be emphasized that a motion for continuance is addressed to the sound discretion of the trial judge, and the refusal to grant a continuance will not be disturbed by the appellate courts unless it clearly appears that the judge abused his discretion in this regard. *Dutton v. State,* 228 Ga. 850 (2) (188 SE2d 794) and numerous citations.

Here, the motion for continuance emanated from a report of appellant's mental condition, made upon his counsel's request, by Larry J. Sheppard, a psychiatrist of the Diagnostic Evaluation Center of the State Board of Probation. This report was received shortly before call of the case for trial.

The summary of the report was as follows: "Due to the data collected in [appellant's] behalf, the test results available at present time and the condition present at the time of the original

evaluation, a more complete and thorough psychological and/or psychiatric examination is strongly recommended. It appears at this time that [appellant] is functioning on the verge of a possible break into a psychotic level of functioning. The segregation of this fact from his level of mental functioning, as well as, the full implications and the importance of his seemingly pre-psychotic condition would, in this evaluator's opinion, warrant further investigation prior to complete disposition of his case."

Thereupon appellant's counsel filed a special plea of insanity reciting in essential part that "at this time of trial he is insane . . . and that he is incapable of making his defense or of rendering to his attorneys such assistance as a proper defense to the indictment against him demands." A trial on this plea ensued immediately.

Mr. Sheppard testified as to appellant's mental condition as manifested by an evaluation made on August 1, 1972, reflected in his report. He said that his recommendation for further evaluation was based upon the fact that he did not have the advantage of the psychiatric facility at Milledgeville, with its team of consultants, to observe any changes on a day to day basis. He stated essentially that the appellant was, at the time of his testing, a person of borderline mental retardation and suffering from a schizoid personality pattern, but that he was completely cooperative and rational; and that he could not say that the appellant was incapable of cooperating with his attorney.

This witness was afforded the opportunity of further examining and evaluating the appellant during a recess. He testified that he did not observe any change in the appellant's condition; that with explanation of the court proceedings that were taking place he should be able to understand what was going on and cooperate. When asked if he still agreed with his report that further investigation should be made, Mr. Sheppard replied, "I feel that further observation would of course give added assurance as to the stability of his condition; but, at this time, based upon a second meeting with him, it is my opinion that that would not give you any additional information." Also, in reply to the question, "You don't think it would determine whether or not he could be insane at a certain time and not at another time?," his answer was, "I do not feel it would, no."

The witness Arnett testified that he was with the appellant on April 22 and 23, 1972, while investigating the alleged offenses and that the appellant did not appear abnormal and he believed him

to be sane.

The sister of the deceased Cross, Mrs. Linda Green, testified as to her family having known the appellant for many years, that he assisted them in various tasks, and that he understood instructions.

Before the jury rendered its verdict against the special plea of insanity at the trial, the appellant restated his prior oral motion for continuance, essentially as follows: "We would at this time move for a continuance in this case for the purpose of having the defendant sent to [be] examined by a psychiatrist to determine whether or not he is sane or insane or whether or not he was sane at the time of the alleged offenses. We feel that based upon the testimony of Mr. Sheppard and his report . . . that . . . further investigation prior to complete disposition of this case would be indicated makes it incumbent upon the court to grant us a continuance at this time so that we will know whether or not we should defend on this ground because at this point there is no way for us to know whether or not a plea or a defense of temporary insanity at the time of commission of the crime would be a proper defense . . . so that it could be determined by competent people as to whether or not his sanity was such at the time of the commission of the act that he could know right from wrong . . ."

In view of what had transpired we regard as quite fitting the concise remark of the trial judge, that "there really hasn't been anything to indicate that this man doesn't know what he's doing — doesn't understand what he's doing. No one has appeared to indicate anything that at any time in the past he has ever indicated that he didn't know what he was doing; didn't understand what he was doing. There's no indication of that that would authorize a continuance of this case . . ."

We agree. We find no abuse of discretion and thus no error here.

■ Issues relating to rebuttal and impeaching evidence are expressly presented by Enumerations of Error 6, 7, 9 and 10, and also by Enumeration 1 which raises the same issues as grounds of the motion for new trial.

These enumerations will be treated in chronological order of the events upon which they are based.

Enumeration 7 asserts that the court erred in allowing the state to offer evidence which did not rebut any evidence offered by the appellant. It does not deal with any particular witness and therefore will be considered with others which do.

Enumeration 10 insists that it was error to permit the state

to present Dr. Goldman as a witness before the jury for the purpose of rebuttal since his testimony did not rebut the unsworn statement of appellant.

Enumeration 9 maintains that the court erred in allowing the witness Arnett to testify for the state in rebuttal, over objection of appellant, when this testimony did not rebut appellant's unsworn statement.

Enumeration 6 urges that the court erroneously charged the jury in stated language with refernece to impeachment as to testimony of the witness Arnett, which charge was not authorized by the evidence, was improper and was harmful to appellant.

(a) No error was committed insofar as Dr. Goldman was concerned. While he took the stand for the avowed purpose of rebuttal to the unsworn statement by the appellant, his testimony contributed nothing of any consequence. He gave his name, profession, specialty, qualifications and hospital association. He also said that he had not examined the alleged rape victim; that she had been examined at Grady Hospital in Atlanta; that a "procedure" was performed on her there; that he had medical records on her from the hospital; that these records were kept in the ordinary course of business at the hospital; and that he knew who performed the procedure.

Thereupon the trial court sustained the appellant's objection to testimony by this witness as not in rebuttal to anything said by him in his unsworn statement.

However, the appellant contends that since the jury was present while the foregoing transpired it was made to appear to the jury that he was trying to conceal something to which this witness could testify, and that allowing the witness to testify as he did was harmful and error for the court to have permitted it.

We do not regard this contention to be sound. The jury had already been present to hear the alleged rape victim testify that she had an abortion at this hospital, her testimony on this being fully covered by cross examination. Furthermore, the state's attorney had made a reference to the records brought by this witness, and upon objection by appellant's counsel the jury was instructed to "completely disregard those remarks from their minds and wipe them out completely in consideration of this case."

For the foregoing reasons we find no reversible error here.

(b) There was no error as to Arnett's testimony for two reasons.

First, the appellant failed to make a timely objection to the evidence being offered as rebuttal by the witness Arnett.

Examination of the record shows that when state's counsel questioned Arnett as to the appellant's earlier statement to him, appellant's counsel objected. However, the trial judge stated that this question was too general and must be limited to the purpose of impeachment in rebuttal of the unsworn statement. The state's counsel rephrased the question to comply with the ruling and there was no objection by the appellant to the question as rephrased. In this situation this court can not consider the issue made here for the first time in the enumeration of error. See *Clenney v. State,* 229 Ga. 561 (3) (192 SE2d 907).

Second, this testimony was properly admitted for the purpose of impeaching the credibility of appellant's unsworn statement that the alleged rape victim scratched his neck and side where Cross lay after the shooting, rather than when he raped her.

Arnett testified that in a prior statement to him, the appellant said that he saw a prowler or thought that he saw a prowler; that he fired a shot and that when he saw "it was Bill" he panicked and did not remember anything after that until driving the car and stopping for gas.

The state correctly relied upon *Colbert v. State,* 124 Ga. App. 283 (2) (183 SE2d 476), which is based upon Harris v. New York, 401 U. S. 222 (91 SC 643, 28 LE2d 1). It held that "If on the trial of his case the defendant takes the witness stand and swears to a state of facts contrary to his prior statements, they may be given in evidence solely for purposes of impeachment, the burden being on the court to caution the jury that such evidence is to be considered only for the purpose of assessing the defendant's credibility and not to establish his guilt of the offense for which he is on trial; however, where the evidence is not offered solely for the purpose nor does the trial judge instruct the jury to consider it solely for purposes of impeachment, its admission is error."

The admission of such evidence here for this limited purpose with instruction to the jury was not erroneous.

(c) The cautionary instruction given in this regard was as follows: "Now, Members of the Jury, this morning one of the witnesses for the State was allowed to testify over the objection of the defendant regarding certain statements made by the defendant, the witness being Mr. Arnett, which Mr. Arnett testified were made to him in an interrogation in the Bibb County jail after the arrest of the defendant. I charge you that such evidence was admitted not to prove any facts stated in such statement or contended to have been made in such statement but

solely for the purpose of attempting to impeach the credibility of the defendant.

"To impeach means to attack the credibility of someone and one method of impeachment is by proof of contradictory statements made by a witness which are relevant to the issues on trial and to the case. The sole purpose for which Mr. Arnett's testimony made this morning regarding certain statements by the defendant to Mr. Arnett while he was in custody, the sole purpose for admitting such statements was for the purpose of attempting to impeach the statement of the defendant.

"When an effort is made to impeach, the jury then becomes the triers of the credibility of the person sought to be impeached, and accordingly, you have the right under all the attendant facts and circumstances and conditions to determine whether or not the defendant has made, in fact, any contradictory statement or statements which are relevant to the issues on trial and to the case and thereupon decide whether or not he has been impeached. The credit to be given the testimony of one who has been impeached for contradictory statements is for the jury to determine."

This instruction was not subject to any of the criticism made of it. Indeed, without it reversible error might well have been committed. See *Colbert v. State,* 124 Ga. App. 283, 285, supra.

■ The remaining Enumerations 11 through 21 insist that the trial court erred in refusing to give the jury eleven separate instructions requested by the appellant. However, examination of the charge that was given shows that it substantially covered the principles embodied in the requested charges, and therefore there was no error in failing to give the requested instructions in the exact language requested. See *Jackson v. State,* 225 Ga. 553 (7) (170 SE2d 281); *McLarty v. Emhart Corp.,* 227 Ga. 104 (4) (179 SE2d 46); *Harkness v. Harkness,* 228 Ga. 184 (2) (184 SE2d 566); *Hardwick v. Price,* 114 Ga. App. 817 (3) (152 SE2d 905).

We find no error in the proceedings.

*Judgment affirmed. All the Justices concur.*