## OREGON v. HASS

No. 73–1452. Argued January 21, 1975—Decided March 19, 1975

*Thomas H. Denney,* Assistant Attorney General of Oregon, argued the cause for petitioner. With him on the briefs were *Lee Johnson,* Attorney General, and *W. Michael Gillette,* Assistant Attorney General.

*Sam A. McKeen* argued the cause for respondent. With him on the brief was *Enver Bozgoz.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents a variation of the fact situation encountered by the Court in *Harris* v. *New York,* 401 U. S. 222 (1971): When a suspect, who is in the custody of a state police officer, has been given full *Miranda* warnings[1]

---

[1] *Miranda* v. *Arizona,* 384 U. S. 436, 467–473 (1966).

and accepts them, and then later states that he would like to telephone a lawyer but is told that this cannot be done until the officer and the suspect reach the station, and the suspect then provides inculpatory information, is that information admissible in evidence solely for impeachment purposes after the suspect has taken the stand and testified contrarily to the inculpatory information, or is it inadmissible under the Fifth and Fourteenth Amendments?

## I

The facts are not in dispute. In August 1972, bicycles were taken from two residential garages in the Moyina Heights area of Klamath Falls, Ore. Respondent Hass, in due course, was indicted for burglary in the first degree, in violation of Ore. Rev. Stat. § 164.225, with respect to the bicycle taken from the garage attached to one of the residences, a house occupied by a family named Lehman. He was not charged with the other burglary.

On the day of the thefts, Officer Osterholme of the Oregon State Police traced an automobile license number to the place where Hass lived. The officer met Hass there and placed him under arrest. App. 15. At Hass' trial Osterholme testified *in camera* that, after giving Hass the warnings prescribed by *Miranda* v. *Arizona,* 384 U. S. 436, 467–473 (1966), he asked Hass about the theft of the bicycle taken from the Lehman residence. Hass admitted that he had taken two bicycles but stated that he was not sure, at first, which one Osterholme was talking about. App. 10. He further said that he had returned one of them and that the other was where he had left it. *Id.,* at 12. Osterholme and Hass then departed in a patrol car for the site. *Id.,* at 12–13. On the way Hass opined that he "was in a lot of trouble," *id.,* at 13, 26, and would like to telephone his attorney. *Id.,* at 13. Osterholme replied that he could telephone the lawyer

"as soon as we got to the office." *Ibid.* Thereafter, respondent pointed out a place in the brush where the bicycle was found.

The court ruled that statements made by Hass after he said he wanted to see an attorney, and his identification of the bicycle's location, were not admissible. The prosecution then elicited from Osterholme, in its case in chief before the jury, that Hass had admitted to the witness that he had taken two bicycles that day because he needed money, that he had given one back, and that the other had been recovered. *Id.*, at 31–32.

Later in the trial Hass took the stand. He testified that he and two friends, Walker and Lee, were "just riding around" in his Volkswagen truck, *id.*, at 42; that the other two got out and respondent drove slowly down the street; that Lee suddenly reappeared, tossed a bicycle into the truck, and "ducked down" on the floor of the vehicle, *id.*, at 44; that respondent did not know that Lee "stole it at first," *id.*, at 45; that it was his own intention to get rid of the bike; that they were overtaken by a jeep occupied by Mr. Lehman and his son; that the son pointed out Lee as "that's the guy," *id.*, at 46; that Lee then returned the bike to the Lehmans; that respondent drove on and came upon Walker "sitting down there and he had this other bicycle by him," and threw it into the truck, *id.*, at 48; that he, respondent, went "out by Washburn Way and I threw it as far as I could," [2] *ibid.*; that later he told police he had stolen two bicycles, *id.*, at 49; that he had had no idea what Lee and Walker were going to do, *id.*, at 61; and that he did not see any of the

---

[2] Hass' testimony would appear to be an admission of guilt of the Oregon crime of "theft by receiving," Ore. Rev. Stat. § 164.095, that is, the receipt or disposal of property of another, knowing that the property was stolen. Hass, however, was not charged with that offense.

bikes being taken and did not know "where those residences were located," *id.,* at 63.

The prosecution then recalled Officer Osterholme in rebuttal. He testified that Hass had pointed out the two houses from which the bicycles were taken. *Id.,* at 65. On cross-examination, the officer testified that, prior to so doing, Hass had told Osterholme "that he knew where the bicycles came from, however, he didn't know the exact street address." *Id.,* at 66. Osterholme also stated that Lee was along at the time but that Lee "had some difficulty" in identifying the residences "until Mr. Hass actually pointed them" and then "he recognized it." *Id.,* at 78.

The trial court, at the request of the defense, then advised the jury that the portion of Officer Osterholme's testimony describing the statement made by Hass to him "may not be used by you as proof of the Defendant's guilt . . . but you may consider that testimony only as it bears on the [credibility] of the Defendant as a witness when he testified on the witness stand." *Id.,* at 79.

Respondent again took the stand and said that Osterholme's testimony that he took him out to the residences and that respondent pointed out the houses was "wrong." *Id.,* at 81.

The jury returned a verdict of guilty. Hass received a sentence of two years' probation and a $250 fine. The Oregon Court of Appeals, feeling itself bound by the earlier Oregon decision in *State* v. *Brewton,* 247 Ore. 241, 422 P. 2d 581, cert. denied, 387 U. S. 943 (1967), a pre-*Harris* case, reversed on the ground that Hass' statements were improperly used to impeach his testimony. 13 Ore. App. 368, 374, 510 P. 2d 852, 855 (1973). On petition for review, the Supreme Court of Oregon, by a 4-to-3 vote, affirmed. 267 Ore. 489, 517 P. 2d 671 (1973). The court reasoned that in a situation of proper *Miranda* warn-

ings, as here, the police have nothing to lose, and perhaps could gain something, for impeachment purposes, by continuing their interrogation after the warnings; thus, there is no deterrence. In contrast, the court said, where warnings are yet to be given, there is an element of deterrence, for the police "will not take the chance of losing incriminating evidence for their case in chief by not giving adequate warnings." *Id.*, at 492, 517 P. 2d, at 673. The three dissenters perceived no difference between the two situations. *Id.*, at 493–495, 517 P. 2d, at 674. Because the result was in conflict with that reached by the North Carolina court in *State* v. *Bryant*, 280 N. C. 551, 554–556, 187 S. E. 2d 111, 113–114 (1972),[3] and because it bore upon the reach of our decision in *Harris* v. *New York*, 401 U. S. 222 (1971), we granted certiorari. 419 U. S. 823 (1974). We reverse.

## II

The respondent raises some preliminary arguments. We mention them in passing:

---

[3] See also *United States ex rel. Wright* v. *LaVallee*, 471 F. 2d 123, 125 (CA2 1972), cert. denied, 414 U. S. 867 (1973); *United States ex rel. Padgett* v. *Russell*, 332 F. Supp. 41 (ED Pa. 1971); *State* v. *Johnson*, 109 Ariz. 70, 505 P. 2d 241 (1973); *Rooks* v. *State*, 250 Ark. 561, 466 S. W. 2d 478 (1971); *People* v. *Nudd*, 12 Cal. 3d 204, 524 P. 2d 844 (1974), cert. pending, No. 74–5472; *Jorgenson* v. *People*, 174 Colo. 144, 482 P. 2d 962 (1971); *Williams* v. *State*, 301 A. 2d 88 (Del. 1973); *State* v. *Retherford*, 270 So. 2d 363 (Fla. 1972), cert. denied, 412 U. S. 953 (1973); *Campbell* v. *State*, 231 Ga. 69, 200 S. E. 2d 690 (1973); *People* v. *Moore*, 54 Ill. 2d 33, 294 N. E. 2d 297, cert. denied, 412 U. S. 943 (1973); *Davis* v. *State*, 257 Ind. 46, 271 N. E. 2d 893 (1971); *Sabatini* v. *State*, 14 Md. App. 431, 287 A. 2d 511 (1972); *Commonwealth* v. *Harris*, —— Mass. ——, 303 N. E. 2d 115 (1973); *State* v. *Kish*, 28 Utah 2d 430, 503 P. 2d 1208 (1972); *Riddell* v. *Rhay*, 79 Wash. 2d 248, 484 P. 2d 907, cert. denied, 404 U. S. 974 (1971); *Ameen* v. *State*, 51 Wis. 2d 175, 186 N. W. 2d 206 (1971). Cf. *Commonwealth* v. *Horner*, 453 Pa. 435, 441, 309 A. 2d 552, 555 (1973).

1. Hass suggests that "when state law is more restrictive against the prosecution than federal law," this Court has no power "to compel a state to conform to federal law." Brief for Respondent 1. This, apparently, is proffered as a reference to our expressions that a State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards. See, *e. g., Cooper* v. *California,* 386 U. S. 58, 62 (1967); *Sibron* v. *New York,* 392 U. S. 40, 60–61 (1968). See also *State* v. *Kaluna,* 55 Haw. 361, 368–369, 520 P. 2d 51, 58–59 (1974). But, of course, a State may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them.[4] See *Smayda* v. *United States,* 352 F. 2d 251, 253 (CA9 1965), cert. denied, 382 U. S. 981 (1966); *Aftanase* v. *Economy Baler Co.,* 343 F. 2d 187, 193 (CA8 1965).

Although Oregon has a constitutional provision against compulsory self-incrimination in any criminal prosecution, Ore. Const., Art. 1, § 12, the present case was decided by the Oregon courts on Fifth and Fourteenth Amendment grounds. The decision did not rest on the Oregon Constitution or state law; neither was cited. The fact that the Oregon courts found it necessary to at-

---

[4] The respondent would take comfort in the following pronouncement of the Supreme Court of Oregon in *State* v. *Florance,* 270 Ore. 169, 182, 527 P. 2d 1202, 1208 (1974), a search and seizure case:

"If we choose we can continue to apply this interpretation. We can do so by interpreting Article 1, § 9, of the Oregon constitutional prohibition of unreasonable searches and seizures as being more restrictive than the Fourth Amendment of the federal constitution. Or we can interpret the Fourth Amendment more restrictively than interpreted by the United States Supreme Court" (footnote omitted). The second sentence of this quoted excerpt is, of course, good law. The last sentence, unsupported by any cited authority, is not the law and surely must be an inadvertent error; in any event, we reject it.

tempt to distinguish *Harris* v. *New York, supra,* reveals the federal basis.

2. *Hass* suggests that a decision by a State's highest court in favor of a criminal defendant is not reviewable here. This, we assume, is a standing argument advanced on the theory that the State is not aggrieved by the Oregon judgment. Surely, a holding that, for constitutional reasons, the prosecution may not utilize otherwise relevant evidence makes the State an aggrieved party for purposes of review. This should be self-evident, but cases such as *California* v. *Green,* 399 U. S. 149 (1970), manifest its validity.

3. *State* v. *Brewton,* 247 Ore. 241, 422 P. 2d 581 (1967), by which the Oregon Court of Appeals in the present case felt itself bound, merits comment. There the Oregon court, again by a 4-to-3 vote, held that statements, elicited from a murder defendant, that were inadmissible in the State's case in chief because they had not been preceded by adequate warnings, could not be used to impeach the defendant's own testimony even though the statements had been voluntarily made.

In the present case the Supreme Court of Oregon stated that it took review "for the purpose of deciding whether we wished to overrule *Brewton,*" 267 Ore., at 492, 517 P. 2d, at 673. It found it "not necessary to make that determination" because, in the majority view, *Brewton* and *Harris* were distinguishable. *Ibid.* As set forth below, we are unable so to distinguish the two cases. Furthermore, *Brewton* is pre-*Harris.*

## III

This takes us to the real issue, namely, that of the bearing of *Harris* v. *New York* upon this case.

In *Harris,* the defendant was charged by the State in a two-count indictment with twice selling heroin to an

undercover police officer. The prosecution introduced evidence of the two sales. Harris took the stand in his own defense. He denied the first sale and described the second as one of baking powder utilized as part of a scheme to defraud the purchaser. On cross-examination, Harris was asked whether he had made specified statements to the police immediately following his arrest; the statements partially contradicted Harris' testimony. In response, Harris testified that he could not remember the questions or answers recited by the prosecutor. The trial court instructed the jury that the statements attributed to Harris could be used only in passing on his credibility and not as evidence of guilt. The jury returned a verdict of guilty on the second count of the indictment.

The prosecution had not sought to use the statements in its case in chief, for it conceded that they were inadmissible under *Miranda* because Harris had not been advised of his right to appointed counsel. THE CHIEF JUSTICE, speaking for the Court, observed, 401 U. S., at 224: "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." Relying on *Walder* v. *United States*, 347 U. S. 62 (1954), a Fourth Amendment case, we ruled that there was no "difference in principle" between *Walder* and *Harris;* that the "impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility"; that the "benefits of this process should not be lost"; that, "[a]ssuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief," 401 U. S., at 225, and that the "shield provided by *Miranda* cannot be perverted into a license to use perjury

by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.*, at 226. It was held, accordingly, that Harris' credibility was appropriately impeached by the use of his earlier conflicting statements.

We see no valid distinction to be made in the application of the principles of *Harris* to that case and to Hass' case. Hass' statements were made after the defendant knew Osterholme's opposing testimony had been ruled inadmissible for the prosecution's case in chief.

As in *Harris*, it does not follow from *Miranda* that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, always provided that "the trustworthiness of the evidence satisfies legal standards." 401 U. S., at 224. Again, the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, "the benefits of this process should not be lost," *id.*, at 225; and, again, making the deterrent-effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in *Harris*, it supports and demands a like result in Hass' case. Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances.

We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution. There is no evidence or suggestion that Hass' statements to Officer Osterholme on the way to Moyina Heights were involuntary or coerced. He properly sensed, to be sure, that he was in "trouble"; but the pressure on him was

no greater than that on any person in like custody or under inquiry by any investigating officer.

The only possible factual distinction between *Harris* and this case lies in the fact that the *Miranda* warnings given Hass were proper, whereas those given Harris were defective. The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in *Harris*, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer who is aware of the defect the full deterrence remains. The effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.

One might concede that when proper *Miranda* warnings have been given, and the officer then continues his interrogation after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective and the defect is not known to the officer. In any event, the balance was struck in *Harris*, and we are not disposed to change it now. If, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness.

We therefore hold that the Oregon appellate courts were in error when they ruled that Officer Osterholme's testimony on rebuttal was inadmissible on Fifth and

Fourteenth Amendment grounds for purposes of Hass' impeachment. The judgment of the Supreme Court of Oregon is reversed.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

In *Harris* v. *New York,* 401 U. S. 222 (1971), petitioner was not informed of his right to appointed counsel and thus his subsequent statements to police were inadmissible under *Miranda* v. *Arizona,* 384 U. S. 436 (1966). The Court nonetheless permitted the use of those statements to impeach petitioner's trial testimony. The Court today extends *Harris* to a case where the accused was told of his rights and asked for a lawyer, yet police questioning continued in violation of *Miranda.* The statements that resulted are again held admissible for impeachment purposes.

I adhere to my dissent in *Harris* in which I stated that *Miranda* "completely disposes of any distinction between statements used on direct as opposed to cross-examination. 'An incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt and no constitutional distinction can legitimately be drawn.' " *Harris, supra,* at 231. I adhere as well to the view that the judiciary must "avoid even the slightest appearance of sanctioning illegal government conduct." *United States* v. *Calandra,* 414 U. S. 338, 360 (1974) (BRENNAN, J., dissenting). "[I]t is monstrous that courts should aid or abet the law-breaking police officer. It is abiding truth that '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard

of the charter of its own existence.' "  *Harris, supra,* at
232 (BRENNAN, J., dissenting).

The Court's decision today goes beyond *Harris* in
undermining *Miranda.*  Even after *Harris,* police had
some incentive for following *Miranda* by warning an
accused of his right to remain silent and his right to
counsel.  If the warnings were given, the accused might
still make a statement which could be used in the prose-
cution's case in chief.  Under today's holding, however,
once the warnings are given, police have almost no incen-
tive for following *Miranda's* requirement that "[i]f the
individual states that he wants an attorney, the in-
terrogation must cease until an attorney is present."
*Miranda, supra,* at 474.  If the requirement is followed
there will almost surely be no statement since the attor-
ney will advise the accused to remain silent.[1]  If, how-
ever, the requirement is disobeyed, the police may obtain
a statement which can be used for impeachment if the
accused has the temerity to testify in his own defense.[2]
Thus, after today's decision, if an individual states that
he wants an attorney, police interrogation will doubtless
be vigorously pressed to obtain statements before the
attorney arrives.  I am unwilling to join this funda-
mental erosion of Fifth and Sixth Amendment rights and

---

[1] See, *e. g., Watts* v. *Indiana,* 338 U. S. 49, 59 (1949) (Jackson, J.,
concurring in result) ("any lawyer worth his salt will tell the suspect
in no uncertain terms to make no statement to police under any
circumstances").  See also Comment, 80 Yale L. J. 1198, 1220
(1971) ("[the police] realize that as soon as a lawyer arrives there
is little chance that any further questioning will be permitted").

[2] As I pointed out in *Harris* v. *New York,* 401 U. S. 222 (1971),
"the accused is denied an 'unfettered' choice when the decision
whether to take the stand is burdened by the risk that an illegally
obtained prior statement may be introduced to impeach his direct
testimony denying complicity in the crime charged against him."
*Id.,* at 230 (BRENNAN, J., dissenting).

therefore dissent. I would affirm or, at least, remand for further proceedings for the reasons given in Mr. Justice Marshall's dissenting opinion.

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, dissenting.

While I agree with my Brother Brennan that on the merits the judgment of the Oregon Supreme Court was correct, I think it appropriate to add a word about this Court's increasingly common practice of reviewing state-court decisions upholding constitutional claims in criminal cases. See *Michigan* v. *Mosley,* 51 Mich. App. 105, 214 N. W. 2d 564 (1974), cert. granted, 419 U. S. 1119 (1975); *Michigan* v. *Payne,* 412 U. S. 47 (1973); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *California* v. *Byers,* 402 U. S. 424 (1971); *California* v. *Green,* 399 U. S. 149 (1970).

In my view, we have too often rushed to correct state courts in their view of federal constitutional questions without sufficiently considering the risk that we will be drawn into rendering a purely advisory opinion. Plainly, if the Oregon Supreme Court had expressly decided that Hass' statement was inadmissible as a matter of state as well as federal law, this Court could not upset that judgment. See *Jankovich* v. *Indiana Toll Road Comm'n,* 379 U. S. 487 (1965); *Minnesota* v. *National Tea Co.,* 309 U. S. 551 (1940); *Fox Film Corp.* v. *Muller,* 296 U. S. 207 (1935). The sound policy behind this rule was well articulated by Mr. Justice Jackson in *Herb* v. *Pitcairn,* 324 U. S. 117 (1945):

> "This Court from the time of its foundation has adhered to the principle that it will not review judgments of state courts that rest on adequate and independent state grounds. The reason is so obvious that it has rarely been thought to warrant statement.

It is found in the partitioning of power between the state and federal judicial systems and in the limitations of our own jurisdiction. Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Id.*, at 125–126 (citations omitted).

Where we have been unable to say with certainty that the judgment rested solely on federal law grounds, we have refused to rule on the federal issue in the case; the proper course is then either to dismiss the writ as improvidently granted or to remand the case to the state court to clarify the basis of its decision. *California* v. *Krivda,* 409 U. S. 33 (1972); *Mental Hygiene Dept.* v. *Kirchner,* 380 U. S. 194 (1965). Of course, it may often be unclear whether a state court has relied in part on state law in reaching its decision. As the Court said in *Herb* v. *Pitcairn, supra,* however, where the answer does not appear "of record" and is not "clear and decisive,"

"it seems consistent with the respect due the highest courts of states of the Union that they be asked rather than told what they have intended. If this imposes an unwelcome burden it should be mitigated by the knowledge that it is to protect their jurisdiction from unwitting interference as well as to protect our own from unwitting renunciation." 324 U. S., at 128.

From a perusal of the Oregon Supreme Court's opinion it is evident that these exacting standards were not met in this case. The Constitution of Oregon contains an

independent prohibition against compulsory self-incrimination, and there is a distinct possibility that the state court intended to express its view of state as well as federal constitutional law. The majority flatly states that the case was decided below solely on federal constitutional grounds, but I am not so certain. Although the state court did not expressly cite state law in support of its judgment, its opinion suggests that it may well have considered the matter one of state as well as federal law. The court stated that it had initially viewed the issue of the case as whether it should overrule one of its prior precedents in light of this Court's opinion in *Harris* v. *New York,* 401 U. S. 222 (1971). It concluded that it was not required to consider whether to overrule the earlier state case, however, since upon examination it determined that *Harris* did not reach this fact situation. In view of the court's suggestion that the federal constitutional rule in *Harris* would be regarded as merely a persuasive authority even if it were deemed to be squarely in conflict with the state rule, it seems quite possible that the state court intended its decision to rest at least in part on independent state grounds. In any event, I agree with Mr. Justice Jackson that state courts should be "asked rather than told what they have intended."

In addition to the importance of avoiding jurisdictional difficulties, it seems much the better policy to permit the state court the freedom to strike its own balance between individual rights and police practices, at least where the state court's ruling violates no constitutional prohibitions. It is peculiarly within the competence of the highest court of a State to determine that in its jurisdiction the police should be subject to more stringent rules than are required as a federal constitutional minimum.

The Oregon court's decision in this case was not premised on a reluctant adherence to what it deemed federal

law to require, but was based on its independent conclusion that admitting evidence such as that held admissible today will encourage police misconduct in violation of the right against compulsory self-incrimination. This is precisely the setting in which it seems most likely that the state court would apply the State's self-incrimination clause to lessen what it perceives as an intolerable risk of abuse. Accordingly, in my view the Court should not review a state-court decision reversing a conviction unless it is quite clear that the state court has resolved all applicable state-law questions adversely to the defendant and that it feels compelled by its view of the federal constitutional issue to reverse the conviction at hand.

Even if the majority is correct that the Oregon Supreme Court did not intend to express a view of state as well as federal law, this Court should, at the very least, remand the case for such further proceedings as the state court deems appropriate. I can see absolutely no reason for departing from the usual course of remanding the case to permit the state court to consider any other claims, including the possible applicability of state law to the issue treated here. See *Michigan* v. *Payne,* 412 U. S., at 57; *California* v. *Byers,* 402 U. S., at 434; *California* v. *Green,* 399 U. S., at 168–170; C. Wright, Federal Courts 488 (2d ed. 1970); cf. *Georgia Railway & Electric Co.* v. *Decatur,* 297 U. S. 620, 623 (1936). Surely the majority does not mean to suggest that the Oregon Supreme Court is foreclosed from considering the respondent's state-law claims or even ruling *sua sponte* that the statement in question is not admissible as a matter of state law. If so, then I should think this unprecedented assumption of authority will be as much a surprise to the Supreme Court of Oregon as it is to me.

I dissent.