Fuchsberg, J.
(dissenting). I would uphold the Appellate Term in its unanimous determination that the defendant was deprived of a fair trial both because of the admission of the defendant’s refusal to submit to a blood test and because it was error to foreclose the defendant from establishing the hostility of the prosecution’s witnesses.
As I see it, in concluding that evidence of a refusal to submit to a blood test is admissible against an accused in a *111 criminal prosecution, the majority misconceives the essential character of such evidence, which appears fully protected by the Fifth Amendment. This view does not break new ground. Long before the enactment of subdivision 4 of section 1194 of the Vehicle and Traffic Law it reflected the established rule in New York (People v Paddock, 29 NY2d 504; People v Stratton, 1 NY2d 664).
True, Schmerber v California (384 US 757), on which the majority rests much of its argument, rebuffed all Federal constitutional objections to the admissibility of the results of the blood test the defendant there was compelled to undergo. That decision, however, was expressly premised on the distinction between " 'communications’ ” or " 'testimony’ ” on the one hand and " 'real or physical evidence’ ” on the other (384 US, at p 764). I find it difficult to accept the idea that evidence of refusal to submit to a test is not communicative and testimonial. In contrast to physical evidence directly probative of a crime, such as the results of the blood test actually undertaken in Schmerber, the sole purpose for introducing refusal evidence is to permit triers of fact to infer consciousness of guilt (People v Von Werne, 41 NY2d 584, 588; Note, Constitutional Limitations on the Taking of Body Evidence, 78 Yale LJ 1074). ''[I]f a communication, written, oral, or otherwise, involves an accused’s consciousness of the facts and the operations of his mind in expressing it, such is testimonial and communicative in nature” (Dudley v State, 548 SW2d 706, 707 [Tex]; emphasis in original). Interestingly, the Schmerber opinion, which did not reach the question before us now, itself stated "[i]t is clear that the protection of the privilege reaches an accused’s communications, whatever form they might take, and the compulsion of responses which are also communications” (Schmerber, supra, at pp 763-764 [emphasis mine]).[1]
Not surprisingly, then, this court today attempts to base its decision on what it terms a more broadly stated rationale. It argues that the defendant was under no compulsion to refuse to take the test. I respectfully suggest that this approach is *112 more semantic than substantive. How can it be said the defendant in this case was not subjected to compulsion? He had to either submit to the test or refuse to do so; as the statute was structured, either alternative was capable of producing evidence against him. It would not be contended that if an arrested suspect, having been given Miranda warnings, is queried about the crime under investigation, his refusal to answer is admissible against him merely because it was not compelled (see People v Von Werne, 41 NY2d 584, supra). I find this indistinguishable in principle from the present case.
The majority’s reply would apparently be that, in the Miranda context, the defendant has a constitutional right not to respond, whereas Schmerber establishes that there is no constitutional right to refuse to submit to a blood test. The fact is, however, that Schmerber did not say there was no right to refuse to submit to a blood test. It merely held that, when an accused does refuse, compelled submission does not produce inadmissible evidence since a blood sample is physical — as opposed to testimonial or communicative — evidence.[2] Furthermore, though it may well be true that the primary rationale for excluding refusal evidence in the Miranda context has been prophylaxis — any other course might undermine the constitutional protection itself — broader principles are at stake. Refusal evidence is protected in its own right by the Fifth Amendment because it is self incriminating testimony the Government forces from an accused. Indeed, I view it as first cousin to thought control itself.
This is not to denigrate the Legislature’s laudable and necessary attempts to keep the drunk driver off the road, and I have no qualms about revoking the license of a driver who refuses a founded police request to submit to a blood test. But criminal prosecutions under the Vehicle and Traffic Law are another thing. They must comport with the Fifth Amendment. The Legislature’s decision to prohibit compelled blood tests was an enlightened and humane one (see Vehicle and Traffic Law, § 1194, subd 2). But this praiseworthy conduct does not *113 permit the State to impinge on a basic right. I would therefore hold that subdivision 4 of section 1194 of the Vehicle and Traffic Law is unconstitutional and that it was error to admit the defendant’s refusal into evidence.[3]
I am persuaded too that the trial court’s rejection of defense counsel’s offer to impeach the police officer’s testimony with evidence of his hostility to the defendant also commands reversal. The facts bespeak the tenuousness of the People’s case and the importance of the testimony sought to be impeached.
The uncontradicted testimony is that defendant was driving in a rented taxicab when another driver cut him off and caused his vehicle to strike a highway divider. The proof merely was that an accident had happened, hardly an event to be regarded as extraordinary or inculpatory per se in this automobile age; there was no evidence whatsoever as to the operation of the taxicab before the accident, certainly none indicating any conduct associated with drunken driving.
It is conceded that defendant suffered severe injuries. Right after the accident he was bleeding profusely from lacerations on the head so extensive that fully 117 stitches were required for their approximation. As is obvious, observations of a person in such a state are without any worth in deciding whether he is under the influence of alcohol. If anything, defendant’s insistence that the police obtain medical attention for him before anything else bespeaks sobriety. When, midst the emergency treatment at the hospital, the police continued to badger him tq submit to an immediate blood test, his declination was also compatible with a lack of intoxication.
The People relied in the main on the testimony of the officers who claimed they had detected a "heavy” odor of alcohol on the defendant’s breath. But "heaviness” of a breath odor is related more to the type of beverage imbibed (see Erwin, Trial of a Drunk Driving Case, Trauma, Oct., 1959, p 108 [breath tests unreliable]) or the nature of the stomach contents an injured person regurgitates rather than to the quantity of alcohol consumed. It also tells nothing about *114 whether it was ingested too recently to have affected the nervous system. The police also testified that they found two bottles of wine, one unopened, one half full, in the car (see Erwin, Trial of a Drunk Driving Case, Trauma, Oct., 1959, p 49 [at least 16 oz. of 20% fortified wine must be consumed to cause intoxication]). But the car was borrowed. And the vehicle inventory the police prepared made no reference to the bottles; to explain this discrepancy the officers stated they had turned over this valuable evidence of the crime to defendant’s brother. There was no record that they had done so, and the brother categorically denied the story.
Even more to the point, putting aside defendant’s own denial that he was drinking, arrayed against the assertions of the police was disinterested evidence of a highly convincing sort. One was clear proof that defendant was interdicted from drinking alcohol because he suffered from active stomach ulcers. True, people do not always follow the course doctors prescribe for them, but in this case defendant’s claim that he did not drink had some confirmation from the presence in the car of a bottle of Gellusil, a recognized antiacid used to assuage ulcers. Most important, however, was the hospital chart. Though the examination in this case had to have focused closely on defendant’s head, the record not only failed to note any finding of intoxication, but even of any odor of alcohol. This is all the more revealing since standard medical practice calls for neurological tests in head injury cases as a matter of routine. These would disclose any measurable alcoholic effect on reflexes; there was none here. This recital may not be determinative of guilt or innocence; but, at the very least, I suggest it demonstrates that the case was close.
It was in this context — with the police odor-of-alcohol testimony the sole direct evidence of intoxication — that the defense sought to introduce evidence that, on the occasion of the arrest, one of the officers had recognized the defendant as the complainant in a review board proceeding against another officer and had stated that "[the fellow officer was] going to give me a medal for this [arrest]”. Yet, the trial court excluded this proof at every turn. As I see it this constituted an abuse of discretion as a matter of law (People v McDowell, 9 NY2d 12, 15; Richardson, Evidence [10th ed], §§ 503, 504; 3A Wigmore, Evidence [Chadbourn rev, 1970], § 950). I would find nothing remote about the proffered proof. Quite the contrary, if it were to be believed it would have exposed the officer’s *115 contemporaneous awareness of the prior complaint at the time of the arrest and a degree of consciousness great enough for him to have blurted it out to the defendant in words of sarcasm. These would permit the inference of an immediate motive for the charges against the defendant.[4]
All the more is this so in a case where the testimony whose motivation is attacked is at best unreliable. For here the observations, if any, of defendant’s behavior made by the police were scanty, and the officers lacked competence to judge whether the source of any erratic behavior was intoxication as opposed to the aftereffects of the injury and its accompanying shock.
Accordingly, I would affirm the order of the Appellate Term.
Chief Judge Breitel and Judges Jasen, Gabrielli, Wachtler and Cooke concur with Judge Jones; Judge Fuchsberg dissents and votes to affirm in a separate opinion.
Order reversed and the case remitted to the Appellate Term, First Department, for further proceedings in accordance with the opinion herein.

. In any event, we would be entitled to afford defendants in this State greater safeguards than in the Federal system by virtue of our own self incrimination clause (NY Const, art I, § 6) which we are free to interpret more protectively than the Supreme Court does the Fifth Amendment. (See Oregon v Hass, 420 US 714; Cooper v California, 386 US 58; Lego v Twomey, 404 US 477; Barker v Wingo, 407 US 514.) Thus, there is no reason for us to overrule Paddock and Stratton and the sensible approach they take to this problem.

. Moreover, the court expressly conceded that their "conclusion would not necessarily govern had the State tried to show that the accused had incriminated himself when told that he would have to be tested. Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test” (Schmerber, supra, at p 765, n 9). In the present case, the refusal is just such an unavoidable by-product of the police request that the defendant submit to the blood test.

. Because I find subdivision 4 of section 1194 of the Vehicle and Traffic Law to be violative of fundamental Fifth Amendment principles, it is not necessary in this case to treat with the further objection that a refusal to submit to a blood test might be based on factors other than guilt of the charge, whether it be religious opposition, fear of hypodermic needles (see Schmerber, supra, at p 765, n 9), or simply principled objection to this kind of violation of one’s person by the State.

. The majority also argues that the defense had failed to show the relationship between the arresting officer and the target of the complaint. It was the trial court’s hasty interjection, however, that cut off any such attempts, and I would not in any event require such showings with undue strictness because of the unavailability of examinations before trial in criminal cases.