Mike Anthony KIDD *v.* STATE of Arkansas

CA CR 87-140                                         748 S.W.2d 38

Court of Appeals of Arkansas
Division II
Opinion delivered April 13, 1988

*Greene Law Offices*, by: *Robert E. Adcock*, for appellant.

*Steve Clark*, Att'y Gen., by: *Joseph V. Svoboda*, Asst. Att'y Gen., for appellee.

GEORGE K. CRACRAFT, Judge. Mike Anthony Kidd was convicted of aggravated robbery and theft of property for which, being a habitual criminal, he was sentenced to a term of twenty years in the Arkansas Department of Correction. He contends that the trial court erred in refusing to grant a mistrial when the prosecuting attorney used peremptory challenges to exclude blacks from the jury and in allowing testimony to be introduced that appellant used an alias when asked by the police to identify himself. We find no error and affirm.

During jury selection, the prosecuting attorney excused all three black members of the panel by peremptory challenge. After the jury was selected, the appellant moved for a mistrial contending that the exclusion of all black jurors was the result of purposeful discrimination, in violation of the equal protection guarantees of the Fourteenth Amendment to the United States Constitution as declared in *Batson* v. *Kentucky*, 476 U.S. 79 (1986), and *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987). The trial court at first interpreted the motion as one contending that there had been a systematic exclusion of black jurors which would require testimony as to how jury pools had been selected over an extended period. When this was clarified to challenge the selection of this particular jury, the trial court conducted a hearing to determine the basis for the challenges and determined that they had been exercised for reasons unconnected with race. Appellant was then tried and convicted by a jury composed entirely of white persons. The correctness of the court's ruling on appellant's motion is the first issue presented by this appeal.

In *Batson*, the United States Supreme Court held that, although no one has a constitutional right to have a petit jury composed in whole or in part of persons of his own race, he does have a right to be tried by a jury whose members have been

58

selected on non-discriminatory criteria. It held that the equal protection guarantees of the United States Constitution protect a criminal defendant from trial by a jury from which members of his race have been excluded on account of their race. The Arkansas Supreme Court followed *Batson* in its decision in *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987).

The Court determined in *Batson* that it had placed a "crippling burden" on the appellant in *Swain* v. *Alabama*, 380 U.S. 202 (1965), and declared that a criminal defendant need only show facts giving rise to an inference of discriminatory purpose in the exercise of peremptory challenges removing black potential jurors in order to make a prima facie showing of unconstitutional discrimination. Once such a prima facie showing has been made to the satisfaction of the trial court, the burden shifts to the State to establish an adequate, neutral explanation for those exclusions. This explanation need not arise to the level which would justify a strike for cause and the challenge may be made "for any reason at all" so long as the reason relates to the case then being tried and the prosecutor's view concerning its outcome. 476 U.S. at 89. It is only discriminatory and constitutionally prohibited when the prosecutor's challenge is based "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. The Court also made it clear that the prosecutor may not rebut the prima facie case by merely asserting that because of race this particular juror would not be impartial, or by merely denying that he had a discriminatory motive. He must "demonstrate that 'permissible *racially neutral* selection criteria and procedures have produced the monochromatic result.' " 476 U.S. at 94 (emphasis added) (citation omitted). The trial court then has the duty to determine whether the State has rebutted the defendant's prima facie case of purposeful discrimination. The Supreme Court stated that " 'a finding of intentional discrimination is a finding of fact' " and that, "[s]ince the trial court's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." 476 U.S. at 98 n. 21 (citation omitted). *See also United States* v. *Cloyd*, 819 F.2d 836 (8th Cir. 1987); *United States* v. *Love*, 815 F.2d 53 (8th Cir. 1987); *United States* v.

*Woods*, 812 F.2d 1483 (4th Cir. 1987); *United States* v. *Davis*, 809 F.2d 1194 (6th Cir. 1987); *United States* v. *Mathews*, 803 F.2d 325 (7th Cir. 1986).

Here, of the first twelve jurors called for qualification, two were excused for cause and seven were excused through peremptory challenges. The record is not clear as to how many of these challenges were exercised by the State, but it does reflect that the State peremptorily struck at least three jurors—one white woman and two black women. Nine more jurors were called and five were thereafter peremptorily excused. Of the two peremptory challenges utilized by the State, one was a black person and the other was white. Appellant apparently exercised a total of seven peremptory challenges.

As all three of the prospective black jurors on the panel had been stricken by the State, the court conducted a hearing, calling upon the prosecutor to explain the bases for those strikes and show that they were not motivated by discrimination against blacks as a group. The prosecuting attorney testified as follows:

> Beginning with, I believe, Tina Dickerson who was juror number 15 seated in the fourth chair. I noted on it at the time that I got through with my questioning of the entire panel, is that Ms. Dickerson sat with her arms folded, and when I asked specific questions in reference to fairness and prejudice, race, be it consideration or age, or any other thing, a number of jurors were nodding. She did not. She stood there like this (indicating), just straight ahead. Okay. And I believe some other questions that finally came down to, and this will be the same as, I believe, Ms. Henson. Is that both of them—.
>
> * * *
>
> It was juror number 39 whoever it was. Both of them at that point in time, they showed no reaction at all. No nodding, nothing. Just a straight ahead look on that question about fairness to both the State and the Defense. And without making a big, long, drawn-out speech and expression of the voir dire selection process, a lot of this is subjective. It had nothing to do with race. It's just that my gut feeling was that those people, for whatever reason, that

they didn't want to be a part and didn't speak up to it, or that they maybe did have an attitude. The State's entitled to a fair trial. And I struck them on that basis.

\* \* \*

Now, we're on to Earline Irving. She flat out scowled at me and wouldn't respond to two questions with a yes or no. She had a—Her mouth, in fact, turned down. And she sat there the entire time just looking at me with that scowl. And that was my basis for juror number 5 Earline Irving, seated in the ninth chair.

\* \* \*

And I did not, in this case nor I do on a systematic basis, strike because of race. As an example would be the fact that this is the second trial on this matter within a week, and last week there was a black that I could've struck but did not. To again show corroboration that this was based on my feelings towards the juror as an individual, not just because she's white or black. Further, I would note on this that I also struck juror number one, white female, by the name of Mary Price. My opinion of her was simply because her background is that she was too liberal, and if she did convict, she may not consider the full range of punishment.

■ Here, the prosecutor averred that he had not peremptorily excused the potential jurors on the assumption that, because of their race, they could not fairly decide the issues. He stated that he had done so because of inattentiveness during *voir dire*, failure to respond to questions as to the ability to fairly determine the issue without regard to race or age of the defendant, and perceived hostility toward the prosecution—reasons strikingly similar to those upheld in *United States* v. *Mathews*, 803 F.2d 325 (7th Cir. 1986). The trial court's determination that the challenges were made for racially neutral reasons was a permissible finding under *Batson*. Giving due deference to the trial court's presence during *voir dire* and its superior position to judge the credibility of the prosecutor's statements, we cannot conclude that the findings are clearly erroneous.

■ Appellant argues that we should expand the construc-

tion of this Fourteenth Amendment prohibition beyond the holding in *Batson* and declare that the prosecutor's reasons for the strikes must rise above the level of racial neutrality and constitute "good cause." We could not do so even if we were so inclined. This was not the holding in *Batson* nor the construction placed on it by those federal courts which have since applied this Fourteenth Amendment prohibition. Although a state court may interpret its own constitutional prohibitions more restrictively against the prosecution than its federal counterparts have under federal constitutional standards, it cannot impress a greater restriction as a matter of *federal constitutional law* when the Supreme Court of the United States has specifically refrained from doing so. *Oregon* v. *Haas*, 420 U.S. 714 (1975). *See also Fare* v. *Michael C.*, 439 U.S. 1311 (1978). Here, the appellant makes no argument under the Arkansas Constitution or other Arkansas law but relies solely on the United States Constitution, the Supreme Court's decision in *Batson*, and the Arkansas Supreme Court's decision in *Ward*, which merely applied *Batson*.

Appellant next argues that the trial court erred in permitting a police officer to testify that, upon apprehension, appellant identified himself using an alias. He contends that admission of this evidence violated Ark. R. Evid. 404(b) because it could only have been offered to show bad character and was designed to impeach him before his character was placed in issue. We disagree.

The evidence discloses that the appellant and three other persons entered a convenience store and committed acts which the appellant does not dispute constitute aggravated robbery. They took two young women, dragged them by their hair from the front of the store to the rear, locked them in a ladies' room, and warned them not to come out unless they wanted to be killed. After a high-speed chase the police apprehended and arrested the four robbers, one of whom was identified as this appellant. They were taken to the police station and asked to identify themselves. All four gave fictitious names, with appellant giving the name of a person who had died in an automobile accident several weeks before. The appellant argues that the trial court should not have permitted the testimony that he used an alias.

Rule 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Here, the testimony about which appellant complains was obviously introduced as circumstantial evidence of guilt, much in the same way evidence of flight from the scene of a crime is,[1] and not to prove that the appellant was of bad character in order to show that he acted in conformity therewith on this occasion. The use of a false name after the commission of a crime is commonly accepted as being relevant on the issue of consciousness of guilt. *See e.g., United States* v. *Boyle*, 675 F.2d 430 (1st Cir. 1982). In this regard, E. Cleary, *McCormick on Evidence* § 271(c), at 803 (3rd ed. 1984) provides:

"The wicked flee when no man pursueth." Many acts of a defendant after the crime seeking to escape the toils of the law are uncritically received as admissions by conduct, constituting circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself. In this class are flight from the scene or from one's usual haunts after the crime, *assuming a false name*, shaving off a beard, resisting arrest, attempting to bribe arresting officers, forfeiture of bond by failure to appear, escapes or attempted escapes from confinement, and attempts of the accused to take his own life.

(Emphasis added) (footnotes omitted).

Furthermore, with specific reference to Rule 404(b), the same text states that one application of the rule that evidence of other bad acts is admissible for certain purposes "permits proof of criminal acts of the accused that constitute admissions by conduct designed to obstruct justice or avoid punishment for a crime." *Id.* § 190, at 562 (footnotes omitted). From our review of

---

[1] *See, e.g., Mason* v. *State*, 285 Ark. 479, 688 S.W.2d 299 (1985); *Ashley* v. *State*, 22 Ark. App. 73, 732 S.W.2d 872 (1987).

this record, we cannot conclude that the trial court erred in permitting evidence that the appellant gave a false name to the police upon his apprehension.

Affirmed.

CORBIN, C.J., and MAYFIELD, J., agree.