NO. _____

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
1/8/2015
ABEL ACOSTA, CLERK

*In re*
GARCIA GLEN WHITE,
Relator-Petitioner

# ORIGINAL PETITION FOR WRIT OF HABEAS CORPUS
# OR, IN THE ALTERNATIVE,
# ORIGINAL PETITION FOR WRIT OF PROHIBITION,
# AND MOTION FOR STAY OF EXECUTION

**THIS IS A DEATH PENALTY CASE.**
MR. WHITE IS SCHEDULED TO BE EXECUTED
ON JANUARY 28, 2015

**Pat McCann - Counsel**
SBOT: 00792680
909 Texas Ave, Ste. 205
Houston, Texas 77002
Phone: 713) 223-3805
writlawyer@justice.com

**Mandy Miller – Co-Counsel**
SBOT: 24055561
2910 Comm. Center Blvd, # 103-201
Katy, Texas
Phone: 832) 900-9884
mandy@mandymillerlegal.com

## IDENTIFICATION OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 52.3(a), undersigned counsel sets out a list of all parties, and the names and addresses of all counsel.

Respondent - **Rick Thaler**,
      Director of the Texas Department of Criminal Justice
      Institutional Corrections Division
      P.O. Box 13084 - Capitol Station
      Austin, TX 78711-3084

Counsel for Respondent-**Edward L. Marshall**,
      Chief, Postconviction Litigation Division
      Office of the Attorney General
      330 W. 15th Street, 8th Floor,
      William P. Clements Building
      Austin, Texas 78701

Criminal District Attorney, Harris County, Texas-**Devon Anderson**,
      1201 Franklin Street
      Houston, Texas 77002

Chief, Writs division, Harris County District Attorney's Office- **Lynn Hardaway**,
      1201 Franklin Street
      Houston, Texas 77002

Relator/Petitioner-**Garcia Glen White**,
      Texas Department of Criminal Justice, Death Row
      Polunsky Unit
      3872 F.M. 350 South
      Livingston, Texas 77351

Counsel for Relator/Petitioner-**Pat McCann and Mandy Miller**

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES AND COUNSEL................................................ii

STATEMENT OF THE CASE.........................................................................4

STATEMENT OF JURISDICTION..................................................................5

ISSUES PRESENTED..................................................................................6

STATEMENT OF FACTS.............................................................................6

ARGUMENT...............................................................................................7

RELIEF REQUESTED AND PRAYER...........................................................12

CERTIFICATE OF SERVICE.......................................................................14

VERIFICATION.........................................................................................15

EXHIBITS.................................................................................................16

APPENDIX

Exhibit 1: Judgment of Conviction and Sentence

Exhibit 2: Order Setting Execution

Exhibit 3: Report of Dr. Averill

Exhibit 4: Report of Dr. Jerome Brown

Exhibit 5: Transcript of Interview with Garcia G. White – State's Exhibit: 56a

NO. _____

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

*In re*
GARCIA GLEN WHITE,
Relator-Petitioner

# ORIGINAL PETITION FOR WRIT OF HABEAS CORPUS OR, IN THE ALTERNATIVE, ORIGINAL PETITION FOR WRIT OF PROHIBITION, AND MOTION FOR STAY OF EXECUTION

**THIS IS A DEATH PENALTY CASE.**
MR. WHITE IS SCHEDULED TO BE EXECUTED
ON JANUARY 28, 2015

## STATEMENT OF THE CASE

Mr. White faces execution pursuant to a death warrant issued by the convicting court to the Texas Department of Criminal Justice, Institutional Division, pursuant to a conviction for Capital Murder and sentence of death in the 180th District Court, the Hon. Debbie Stricklin presiding in 1996. His direct appeal was affirmed. No petition for writ of certiorari was filed. Mr. White has filed a series of habeas applications, which have been reviewed by the Fifth Circuit and the Supreme Court of the United States. No other petitions are currently pending.

**STATEMENT OF JURISDICTION**

This Court has original habeas corpus jurisdiction under Article V, § 5 of the Texas Constitution and Article 4.04 of the Texas Code of Criminal Procedure. And no statute limits the authority or jurisdiction of this Court to consider an original habeas application. *See Ex rel. Wilson v. Briggs*, 351 S.W.2d 892, 894 (Tex. Crim. App. 1961) ("The original jurisdiction of this court to issue writs of habeas corpus is unlimited.").

This Court has original jurisdiction to issue a writ of prohibition under Article V, § 5 of the Texas Constitution and Article 4.04 of the Texas Code of Criminal Procedure. As this Court may issue a writ of mandamus to correct an order that a judge had no power to render and that was, therefore, void[1], it has a similar authority to issue a writ of prohibition to bar a respondent from carrying out an act based upon a null and void judgment. If an order is void, then a relator need not show that he did not have an adequate appellate remedy. *In re Dickason*, 987 S.W.2d 570, 571 (Tex. 1998); *In re Union Pacific Resources Co.*, 969 S.W.2d 427, 428 (Tex. 1998).

---

[1] *Urbish v. 127th Judicial Dist. Court,* 708 S.W.2d 429, 431 (Tex. 1986)

**ISSUES PRESENTED**

This Original Petition presents two issues for the Court's review:

1. Was Mr. White's invocation of counsel entitled to more deference under Article I, Sec 10 of the Texas Constitution due to his limited borderline IQ?

2. Does the due course of law provision of Article I, Section 19 of the Texas Constitution mandate additional scrutiny of an invocation of counsel when the accused has mental limitations or illness, such as Mr. White manifests?

**STATEMENT OF FACTS**

In 1996, Mr. White was convicted and sentenced to death for the murder of two young girls in the 180th District Court, Hon. D. Stricklin presiding. Mr. White had incidences of head traumas which were introduced at trial. But only on initial and subsequent habeas was his borderline IQ thoroughly vetted and introduced via the reports of two psychological experts. [See Appendices 3 and 4, the reports of Dr. Brown and Averill.]

Mr. White initially became a suspect as a result of the State's key witness, Tecumseh Manuel, Mr. White's friend. After being detained as a suspect in the murders, Mr. White underwent several interviews with police. During one interview, Mr. White attempted to invoke his right to counsel and ask for a lawyer to advise him. He stated that he had the right to have a lawyer present. [See pages

of trial testimony, attached as Exhibit 5 ]. However, the trial judge denied Mr. White's motion to suppress and the Court of Criminal Appeals upheld that decision in an unpublished opinion dated June 17th, 1989.  The Court of Criminal Appeals decision regarding Mr. White's invocation was based only on the federal *Miranda v. Arizona* standard under the Fifth and Fourteenth Amendments.  The Court did not conduct an analysis into whether Mr. White's low IQ should be a factor when considering whether he properly invoked his right to counsel under state constitutional principles.

The question before this Honorable Court then is as follows – what impact does the Texas Constitution have in protecting the liberties of those who are less capable, such as the mentally infirm, the disabled, or minors when it comes to their invocation of counsel?  The Petitioner/Relator argues that the Texas Constitution requires more leniency in interpreting an invocation, under both Article I, Section 10, and Section 19 of the Texas Bill of Rights, and that Mr. White's invocation would qualify.

**ARGUMENTS AND AUTHORITIES IN SUPPORT**

A. Constitutional Analysis

Under our system of federalism, states may provide greater protection to its citizens from government intrusion than the Federal Constitution.  *PruneYard*

*Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).  The Texas Court of Criminal Appeals has recognized that "[t]he federal constitution sets the floor for individual rights; state constitutions establish the ceiling."  *Heitman v. State,* 815 S.W.2d 681, 690 (Tex. Crim. App. 1991)).

Article I, Section 10 of the Texas Constitution states that a person shall have the right to be heard in trial by himself or with the assistance of counsel.  Article I, Section 19 provides that no person shall be deprived of life, liberty, property, or in any way be disenfranchised, without due course of law.  Both of these Sections are worded differently, and more expansively, than their federal counterparts in the Sixth and Fourteenth Amendments. Both were drafted after the federal constitution, and in their original versions were drafted by men who believed Texas would remain a sovereign nation.  There are indications, although not definitive, that the Texas' Bill of Rights derived from such multiple sources as the Spanish civil law, the Magna Charta, the English Bill of Rights, the Virginia Bill of Rights, the Declaration of Independence, the United States Constitution, and the early constitutions of other states, particularly those of Virginia, North Carolina, Pennsylvania, Kentucky and Tennessee.  *See*, J.E. Ericson, Origins of the Texas Bill of Rights, 62 Sw. Hist.Q. 457, 458-66 (1958); *see also*, Matthew W. Paul &

8

Jeffrey L. Van Horn, *Heitman v. State*: The Question Left Unanswered, 23 St. Mary's L.J. 929, 936 (1992).

For over a hundred years, fundamental rights of privacy and protections against arbitrary intrusion by state and local governments were secured only to the extent granted and provided by state constitutions. Newman, The "Old Federalism": Protection of Individual Rights by State Constitutions in an Era of Federal Court Passivity, 15 Conn. L. Rev. 21, 22 (1983). The guarantees in the federal Bill of Rights were not intended to, nor did they protect against "state action." *Barron v. Mayor of Baltimore*, 32 U.S. 242 (1833). Therefore, at the time these Sections were drafted, the Framers had little reason to believe the federal protections would ever extend to them.

In the versions drafted after the Civil War, the legislative representatives had been under military rule for years, and had been oppressed under often corrupt imposed "carpetbagger" governments. Those drafters valued their personal liberties highly enough that they were placed first in the document, not added as an afterthought. To state in any way that the intent of these framers would have been to interpret the Texas Constitution in lock-step with that of a frankly loathed federal government denies history.

Likewise, the plain wording of the Sections indicates a more expansive view of the scope of personal liberties protected. The due course of law language implies direct access to courts, and the proscription against any further disenfranchisement appears to be an additional safeguard. The wording in Article I, Section 10 appears to be somewhat more broadly drafted than the Sixth Amendment, and uses mandatory language as to the right to be heard by the accused, with counsel or by himself. "Construction of a constitutional provision should prevent any clause, sentence, or word from being superfluous, void, or insignificant." *Autran,* 887 S.W.2d at 38 (citing *Cordova v. State,* 6 Tex. App. 207 (1879)).

Although it is admittedly more difficult to determine any original framer intent regarding the issue of how to handle those with mental illness or limitations, there are some contextual, social historical clues in the origin of the Texas State School system, which was specifically designed to care for those with the special needs of limited intellectual functioning. Thus, Texas has a history of special care for such individuals, and the many laws have their origin in that societal sense of helping those who are less capable. There is every reason to extend such care into the criminal justice system.

B. Public Policy reasons and alignment with modern statutes

Our current case law provides for findings of incompetency for mental illness and mental retardation under Article 46B of the Texas Code of Criminal Procedure[2]. The Texas Health and Safety Code provides a detailed listing and discussion of the State's obligations to those who suffer from these maladies, and likewise our own recent statutory interpretations under Article 38.22, Section 6 of the Code of Criminal Procedure indicates that mental illness or retardation may be considered in assessing the voluntariness of an accused's statement. See *Oursbourn v. State*, 259 S.W.3d 159 (2008). Thus, if our current case law appears to acknowledge that the voluntariness of a statement may be reviewed while weighing the capacity of an individual, should not our Texas Constitution permit such a review as to the invocation of counsel?

There is no situation in which a person needs the assistance of counsel more than when that person is either delusional or limited. A clever, educated person is still not versed in law, and would often not know the procedural mistakes that could ensnare them. How then is a person whose functional IQ would make them, for all purposes, a minor, supposed to understand his situation without the assistance of counsel under Article I, Section 10? How much more easily would

---

[2] Modern practice indicates that the term "intellectual disability" is coming to replace the term retardation, however that is still the term in the Code.

he or she be manipulated without a lawyer?  Does not the due course of law under Section 19 mandate that this person, who for whatever reason, the universe has rendered less capable, be given more leniency in their attempts to invoke counsel?

This Court has the right to interpret its own Constitution according to the plain meaning, the intent of the framers, and the unique situation and history of Texas.  It has every right to harmonize the modern statutory trend towards recognition of those in our midst that are less capable, and to extend the Constitution's protections to them in a meaningful way.   That is all we ask.

## RELIEF REQUESTED AND PRAYER

Wherefore, pursuant to the powers of this Honorable Court under Article V, Section V of the Texas Constitution and Article 4.04 of the Texas Code of Criminal Procedure, the Petitioner/Relator respectfully prays this Court will

1) Stay his execution and set this matter for full briefing with argument;

2) Alternatively stay this execution and remand this matter to the convicting court for fact-finding on the issues raised;

3) Grant any and all relief to which the Petitioner/Relator may be entitled.

Respectfully submitted,


/s/ Patrick F. McCann
**Patrick F. McCann**
SBOT: 00792680
909 Texas Ave., Ste. 205
Houston, Texas 77002
713) 223-3805
writlawyer@justice.com



/s/ Mandy Miller
**Mandy Miller**
SBOT: 24055561
2910 Commercial Center Blvd.
Ste. 103-201
Katy, Texas 77494
832) 769-0613
mandy@mandymillerlegal.com

CERTIFICATE OF SERVICE

I, Patrick F. McCann do hereby certify that a true and correct copy of the above and foregoing has been served on <u>January 8th, 2015</u> via hand delivery to the Defendants at: Lynn Hardaway, Harris County District Attorney's Office, 1201 Franklin, Suite 600, Houston, Texas 77002

/s/ Patrick F. McCann
Patrick F. McCann

# VERIFICATION

I, Patrick F. McCann, am the attorney on record for Garcia G. White and verify that this is all true and correct.

Patrick F. McCann

Sworn and subscribed before me on _____1/8/15_____.

ALMA CECILIA ROBLES
Notary Public, State of Texas
My Commission Expires
September 18, 2016

NOTARY PUBLIC - STATE OF TEXAS

15

# EXHIBIT 1

NO. 723 847

NT898 P0206

NT898 P0206

THE STATE OF TEXAS            IN THE ___180___ DISTRICT
VS.

___GARCIA GLEN WHITE___      COURT OF HARRIS COUNTY, TEXAS

_____       Change of Venue From: ___N/A___

**JUDGMENT - DEATH PENALTY**

Judge Presiding: D. M. STRICKLIN     Date of Judgment: 7·23·1996

Attorney
for State: L. McCLELAND & J. WATERS    Attorney
for Defendant: F. FREED & B. BENKEN

Offense
Convicted of: CAPITAL MURDER

> RECORDER'S MEMORANDUM:
> This instrument is of poor quality
> and not satisfactory for photographic
> recordation; and/or alterations were
> present at the time of filming.

Degree: CAPITAL    Punishment Assessed: DEATH    Date Offense Committed: 12·2·1989
Charging Instrument: Indictment           Plea: Not Guilty

Affirmative Findings: (Circle appropriate selection - N/A not available or not applicable)
DEADLY WEAPON: (Yes) No |N/A    FAMILY VIOLENCE: Yes |No (N/A)    HATE CRIME: Yes |No |(N/A)

    The Defendant having been indicted in the above entitled and numbered cause for the felony offense indicated above and this cause being this day called for trial, the State appeared by her District Attorney as named above and the Defendant named above appeared in person with Counsel as named above, and both parties announced ready for trial.

    A Jury composed of MARCUS P. OCONOR and eleven others was selected, impanelled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea of not guilty thereto, after having heard the evidence submitted; and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and having heard argument of counsels, the Jury retired in charge of the proper officer and returned into open Court on ___7-18___, 19_96_, the following verdict, which was received by the Court and is here entered on record upon the minutes:

" WE, THE JURY, FIND THE DEFENDANT, GARCIA GLEN WHITE, GUILTY OF CAPITAL

    MURDER, AS CHARGED IN THE INDICTMENT.

                    /S/ MARCUS P. OCONOR
                    FOREMAN OF THE JURY "

    Thereupon, the Jury, in accordance with law, heard further evidence in consideration of punishment, and having been again charged by the Court, the jury retired in charge of the proper officer in consideration of punishment and returned into open Court on the _23_ day of ___July___, 19_96_, the following verdict, which was received by the Court and is here entered of record upon the minutes:
(Special Issues/Verdict/Certification):

               Special Issue #1

Was the conduct of the defendant, Garcia Glen White, that caused the death of the deceased, Bernette Edwards, committed deliberately and with the reasonable expectation that the death of the deceased, Bernette Edwards, or another would result?

               Answer

We, the jury, unanimously find and determine beyond a reasonable expectation ~~(whether there was death of the deceased, Bernette Edwards, response)~~ to this special issue is "Yes."

                 /S/ MARCUS P. OCONOR
                 FOREMAN OF THE JURY

CRM-95   R06-30-94

SPECIAL ISSUE NO. 2

(Special Issues - Continued): IS THERE A PROBABILITY THAT THE DEFENDANT, GARLIA GLEN WHITE, WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONT . INUNING THREAT TO SOCIETY?

ANSWER

WE, THE JURY, UNANIMOUSLY FIND AND DETERMINE BEYOND A REASONABLE DOUBT THAT THE ANSWER TO THIS SPECIAL ISSUE IS "YES". /S/ MARCUS P OCONOR FOREMAN OF THE JURY

SPECIAL ISSUE NO. 3

DO YOU FIND FROM THE EVIDENCE, TAKING INTO CONSIDERATION ALL OF THE EVIDENCE INCLUDING THE CIRCUMSTANCES OF THE OFFENSE, THE DEFENDANT'S CHARACTER AND BACKGROUND, AND THE PERSONAL MORAL CULPABILITY OF THE DEFENDANT, THAT THERE IS A SUFFICIENT MITIGATING CIRCUMSTANCES OR CIRCUMSTANCES TO WARRANT THAT A SENTENC OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE IMPOSED? YOU ARE INSTRUCTED THAT IN ANSWERING THIS "SPECIAL ISSUE" THAT YOU SHALL ANSWER THE ISSUE "YES" OR "NO". YOU MAY NOT ANSWER THIS ISSUE "NO" UNLESS YOU AGREE UNANIMOUSLY, AND YOU MAY NOT ANSWER THIS ISSUE "YES" UNLESS TEN (10) OR MORE OF YOU AGREE TO DO SO. YOU SHALL CONSIDER MITIGATING EVIDENCE TO BE EVIDENCE THAT A JUROR MIGHT REGARD AS REDUCING THE DEFENDANT'S MORAL BLAME- WORTHINESS.    ANSWER

WE THE JURY, UNANIMOUSLY FIND AND DETERMINE THAT THE ANSWER TO THIS SPECIAL ISSUE IS "NO."    MARCUS P OCONOR FOREMAN OF THE JURY

It is therefore considered, ordered, and adjudged by the Court that the Defendant is guilty of the offense indicated above, a felony, as found by the verdict of the jury, and that the said Defendant committed the said offense on the date indicated above, and that he be punished as has been determined by the Jury, by death, and that Defendant be remanded to jail to await further orders of this court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence against him as follows, to wit, "It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense indicated above and whose punishment has been assessed by the verdict of the jury and the judgment of the Court at Death, shall be delivered by the Sheriff of Harris County, Texas immediately to the Director of the Institutional Division, Texas Department of Criminal Justice or any other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas.

The said Defendant is remanded to jail until said Sheriff can obey the directions of this sentence. From which sentence an appeal is taken as a matter of law to the Court of Criminal Appeals of the State of Texas.

Signed and entered on this the _23rd_ day of _July_, 19_96_.

_Jeffrey Mannooth Micklin_
JUDGE 180TH DISTRICT COURT
Harris County, Texas

On this the 7th day of August 1998 Mandate of Affirmance received from the Court of Criminal Appeals.

CRM-95  06-30-94

STATE OF TEXAS
COUNTY OF HARRIS

I, Chris Daniel, District Clerk of Harris County, Texas, certify that
this is a true and correct copy of the original record filed and or recorded
in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this

1-2-15

CHRIS DANIEL, DISTRICT CLERK
HARRIS COUNTY, TEXAS

_____ Deputy

# EXHIBIT 2

CAUSE NO. 723847

| STATE OF TEXAS | § | IN THE 180TH DISTRICT COURT |
| V. | § | OF |
| GARCIA GLENN WHITE | § | HARRIS COUNTY, TEXAS |

## EXECUTION ORDER

This Court, having received the Mandate from the Court of Criminal Appeals affirming the Defendant's conviction in the above styled and numbered cause and having received notice that the Court of Criminal Appeals denied habeas relief in the defendant's initial petition for writ of habeas corpus, cause no. 723847-A, now enters the following order:

IT IS HEREBY ORDERED that the Defendant, GARCIA GLENN WHITE, who has been adjudged to be guilty of Capital Murder as charged in the indictment and whose punishment has been assessed at Death by the verdict of the jury and judgment of the Court, shall be kept in custody by the Director of the Institutional Division of the Texas Department of Criminal Justice at Huntsville, Texas until Wednesday, the 28th day of January, 2015, upon which day, at the Institutional Division of the Texas Department of Criminal Justice at Huntsville, Texas, at some time after the hour of 6:00 p.m., in a room arranged for the purpose of execution, the said Director, acting by and through the executioner designated by said Director as provided by law, is hereby commanded, ordered and directed to carry out this sentence of death by intravenous injection of a substance or substances in a lethal quantity sufficient to cause the death of the said GARCIA GLENN WHITE and until the said GARCIA GLENN WHITE is dead, such procedure to be determined and supervised by the said Director of the Institutional Division of the Texas Department of Criminal Justice.

The Clerk of this Court shall issue and deliver to the Sheriff of Harris County, Texas, a Death Warrant in accordance with this Order, directed to the Director of the Institutional Division of the Texas Department of Criminal Justice at Huntsville, Texas, commanding him, the said Director, to put into execution the Judgment of Death against the said GARCIA GLENN WHITE. The Sheriff of Harris County,

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Texas is hereby Ordered, upon receipt of said Death Warrant, to deliver said Death Warrant to the Director of the Institutional Division of the Texas Department of Criminal Justice, Huntsville, Texas.

SIGNED AND ENTERED this 28th day of April, 2014.

CATHERINE EVANS
Presiding Judge
180th District Court
Harris County, Texas

2

# EXHIBIT 3

**Patricia M. Averill, Ph.D.**
**Clinical Psychologist**
**3818 Tartan Lane**
**Houston, TX 77025**
**(713) 741-3951**

# Psychological Evaluation

| | |
|---|---|
| **Name:** | Garcia Glenn White |
| **Date of Birth:** | 02/04/1963 |
| **Date of Assessment:** | 07/24/2008 |
| **Date of Report:** | 12/30/2008 |
| **Examiner:** | Patricia M. Averill, Ph.D. |
| **Report Writer:** | Patricia M. Averill, Ph.D. |

**Purpose of Assessment:** Mr. White is a 45 year old African American male who is currently on death row. The purpose of this evaluation is to assess Mr. White's intellectual functioning.

**Examiner Information:** I have been licensed as a clinical psychologist in the State of Texas since 1994 and have been involved in clinical practice continually since that time. I obtained Master's and Doctoral degrees in Clinical Psychology from the University of Houston. I am involved in teaching and research, as well as direct and supervisory clinical work. Much of my direct clinical work has involved conducting psychological assessments, which have included intellectual, personality, and achievement components. The reasons for these evaluations have varied but have included support for a diagnosis of mental retardation, support for a dementia process, evidence of learning disabilities, support for or against termination of parental rights, and levels of care for children in Children's Protective Services. I have conducted four previous psychological evaluations on inmates for court-related information. I also have conducted many psychological evaluations on inmates who are currently in a psychiatric hospital.

**Assessment Instruments:**

- Wechsler Adult Intelligence Scale – Third Edition (WAIS-III)
- Wide Range Achievement Test – Revision 4 (WRAT4)
- Mini Mental Status Exam
- Clinical Interview

**Materials Reviewed:**

To prepare this report I have thoroughly reviewed the following records:
Documents regarding the legal definition of mental retardation
Journal articles on the effects of cocaine abuse

**Definition of Mental Retardation:** According to the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV), Mental Retardation is characterized by "significantly sub-average general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." In order to qualify as mental retardation, the onset of these symptoms must occur before age 18. The DSM-IV characterizes sub-average general intellectual functioning as an IQ of about 70 or below. However, the DSM-IV also explains that, due to a measurement error rate of approximately $\pm 5$ points, IQ's between 65 and 75 can be considered sub-average, provided that there is also support for significant deficits in adaptive behavior. The definition of Mental Retardation under the Texas Health and Safety Code is very similar to that described in DSM-IV, in that it states " 'mental retardation' means significantly sub average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." |Texas Health and Safety Code, Section 591.003(13)|. Thus there is agreement between these two recognized guidelines on what is understood to be mental retardation.

**Relevant History:**

Mr. Garcia Glenn White is a 45-year-old make who reported that he has been on Death Row since September 13, 1996.

Mr. White said that he grew up in a healthy, single-parent family with 6 siblings (3 brothers and 3 sisters). He said that he was the third child. He said that he got along well with his siblings. He denied any awareness of problems during his delivery or any major illnesses during his childhood or during adulthood. He reported that he did incur a head injury at one time, having been hit with a baseball bat. However, he did not report any ongoing problems associated with the head injury.

**Review of School Performance:**

No school records were available. However, Mr. White said that he attended Scott Elementary School, Lamar Fleming Junior High School and Phylis Wheatly High school. He said that he attended regular classes and mostly made C's and D's, however, he said that he would not have passed his classes in high school if he had not been on the football team. He reported that he enjoyed history but did not do well in math, spelling, and science. Mr. White said that he had perfect attendance while in school and that he played football and track. He said that his sister helped him with his homework.

Mr. White attended Lubbock Christian College on a football scholarship. However, he hurt his knee and his girlfriend got pregnant, so he dropped out of college.

Note: all of the following information, regarding work, family, daily living, and substance abuse was gathered during a clinical interview with Mr. White.

**Work History:** Mr. White said that he worked at a company cleaning high-rise building windows from 1983 until 1988. He said that he stopped working for two years and resumed the same work with a different company from 1990 until 1993. Mr. White also said that he tried to sell drugs for a period of time, but then got hooked on them himself, so he stopped selling them. He also reported having worked at Whataburger for a short period of time and he worked for his father's auto mechanic shop.

**Family/Relationship History:** As mentioned earlier, Mr. White grew up in a single-parent family with six siblings. He said that his childhood was happy, and he had plenty of friends. He said that he has always been able to keep people laughing. He continued to have many friends during high school. He also had a girlfriend starting in 1980, who got pregnant while he was in college. His first son was born in 1982 and there are two additional children. He said that he and his girlfriend were together for thirteen years and they still keep in touch. Reportedly his son just graduated from high school and he is working on an offshore oil rig.

**Daily Living:** Mr. White said that he was able to maintain his own apartment with his girlfriend for a while when he was working. However, he lost the apartment due to inability to pay his bills, and his girlfriend got public housing. He said that he did not handle money very well and he gave his money to his girlfriend so she could handle it more appropriately. He said that he had a savings account for a little while but was unable to maintain it. He was able to make his own appointments and take care of his personal needs, both at home and within the community.

**Substance Use:** According to Mr. White, he started using marijuana in the early 1980's and then used used crack cocaine between 1984 and 1989. His employers sent him to Houston Recovery Campus in 1989, where he participated in a drug rehabilitation program. He said that it worked for 8-9 months, but then he started smoking crack cocaine again. He said that he broke up with his girlfriend in 1993, and this was associated with his drug use. He then started living with friends.

**Behavioral Observations:** Mr. White is a tall, very large and somewhat obese male, who was brought down for the initial assessment wearing prison scrubs. The prison guard informed Mr. White that the examiner had been sent by his lawyers to evaluate him. Mr. White said that his lawyer had already informed him that the examiner was coming and he said that he felt fine about participating in the assessment.

Mr. White arrived for the assessment wearing prison scrubs and his grooming and hygiene appeared to be excellent. At times, he was perspiring rather heavily and he wiped himself on a tissue paper. Mr. White was pleasant and cooperative throughout the

assessment period, and he put forth good effort on all the assigned tasks. He seemed motivated to do well and seemed somewhat concerned when he could not continue with a particular test. Based on his level of effort, it is believed that this is an accurate assessment of Mr. White's current level of functioning.

Mr. White was oriented to person, place and time. His speech was normal in tone and volume, but he tended to talk very quickly and at times he tended to mumble. He seemed to have adequate vocabulary skills. His mood appeared to be euthymic and his affect was congruent with his mood. He denied experiencing auditory, visual, or olfactory hallucinations, as well as mood swings. He said that he feels "OK" most of the time. However, he feels upset whenever one of the inmates is executed, because he has come to know the other inmates quite well.

**Intellectual Assessment:** On the WAIS-III, Mr. White obtained a Full Scale IQ of 78 (74-83 - 95% confidence interval, 7th percentile). There was a significant difference between his Verbal and Performance scores (75 and 86, respectively) suggesting that his Full Scale IQ may not be the most accurate reflection of his current intellection functioning. Mr. White's subtest scaled scores are listed below (Note: 10 is the average standard score for each subtest).

| Verbal | Scaled Score | Performance | Scaled Score |
|---|---|---|---|
| Vocabulary | 4 | Picture Completion | 12 |
| Similarities | 7 | Digit Symbol | 6 |
| Arithmetic | 8 | Block Design | 5 |
| Digit Span | 7 | Matrix Reasoning | 9 |
| Information | 7 | Picture Arrangement | 8 |
| Comprehension | 2 | | |

There is some variation in subtest scores within the verbal scales, with Comprehension being an area of significant weakness  This subtest measures ones understanding of social norms. Among the performance subtests, Mr. White obtained a score on Picture Completion that was a significant strength. This subtest measures one's ability to scan and pay attention to detail in familiar objects.

**Achievement Assessment:** On the WRAT4, Mr. White obtained a Word Reading standard score of 79 (6.5 grade, 8th percentile), a Sentence Comprehension score of 82 (9.2 grade, 12th percentile), a Spelling score of 84 (7.3 grade, 14th percentile), a Math Computation score of 76 (4.6 grade, 5th percentile) and a Reading Composite score of 78 (7th percentile). As can be seen, Mr. White's achievement scores are within the range expected based on his IQ but are well below expectations based on his reported completion of high school and one year of college. These scores are consistent with his reported difficulty achieving in school.

**Discussion:** As mentioned previously, Mr. Wright worked hard on all the assigned tasks. As such, this is believed to be an accurate reflection of his current intellectual functioning.

Based on the results listed above, it is apparent that Mr. White is functioning within the Borderline range of intelligence. Based on his WRAT4 achievement scores and his reported poor grades in school it is doubtful that he has ever functioned at a higher level.

Levels of intellectual functioning are on a continuum, with borderline intellectual functioning being just above mild mental retardation. Ninety-three percent of the population function at a higher level of intelligence than do those with borderline intellectual functioning. Thus, although, such individuals do not qualify for the MR diagnosis, they do experience difficulties in many domains, and in particular in academics. According to Mr. White, his grades were poor and would even been worse if not for his being on the football team and having his sister help him with his homework. Also, such individuals have difficulty remaining on task and often have behavioral problems, which may stem from frustration and emotional immaturity.

**Adaptive Functioning:**

Overall, it is difficult to ascertain how Mr. White functioned in many of the domains of adaptive functioning because we only have his self-report and no information from other sources. However, he was able to maintain employment for several years and he had a family. He was not able to maintain housing for his family, nor was he able to manage his own finances, but rather depended upon his girlfriend to take care of the bills. Based on this limited information, it is apparent that Mr. White had some deficiencies in maintaining himself financially. Reportedly, he always got along well with others and had not difficulties with social/interpersonal skills. It is likely that his interpersonal skills helped him to compensate for other intellectual difficulties.

**Summary:**
Overall, this assessment and Mr. White's records indicate that he is functioning in the borderline range of intelligence and it is highly unlikely that he functioned at a higher level in the past, based on his functional achievement. Mr. White's scores were somewhat inflated by his high score on the Picture Completion task, while most of his subtests scores are significantly below average. Mr. White's results indicate that he is one of those individuals who is ineligible for the MR label and associated protections but who, nonetheless, has intellectual limitations that are likely to result in social vulnerabilities. This vulnerability is supported by his very low score on the Comprehension subtest, which assesses one's understanding of social mores.

Patricia M. Averill, Ph.D.

Patricia M. Averill, Ph.D.
Licensed Clinical Psychologist

## Addendum to psychological report dated 12/30/08

A review of the literature regarding cocaine abuse and its sequelae indicates that chronic cocaine users demonstrate mild impairment on neuropsychological testing and they may develop cerebral atrophy, primarily in the frontal and temporal areas of the brain (see Warner, E.A., 1993). Based on the strong correlation between Mr. White's IQ and achievement standard scores, it is very unlikely that his current low functioning can be attributed entirely to his history of cocaine use. However, it is quite possible that his cocaine use compromised an already compromised brain. The frontal area of the brain is associated with the ability to plan, problem –solve, and inhibit inappropriate behaviors.

In addition to the above, cocaine use has been associated with violent behavior. Most of the literature reveals that victims of homicide, particularly by firearms, and also suicide victims, are significantly more likely to test positive for cocaine upon autopsy. Indeed, in 1989, 40% of all homicide victims in Fulton County, Georgia tested positive for cocaine. Similar findings have been reported for Los Angeles County, California (Budd, R.D., 1989). There is not a similar available literature regarding perpetrators of violent crimes, not surprisingly, since the perpetrators are not often available for testing immediately after the crime. However, it is likely that individuals who are high on cocaine are at increased risk for behaving in a violent manner, since some of the symptoms associated with cocaine use include increased alertness, high energy, talkativeness, and repetitive behavior.

Patricia D. Avent, Ph.D

Cause no. _____

## AFFIDAVIT

**THE STATE OF TEXAS**
**COUNTY OF HARRIS**

ONTHIS DAY, the 28th day of JANUARY, 2009, the undersigned below did appear before me and swear and subscribe to the truth of the following:

"My name is MONICA DEBORAH GARRETT and my date of birth is 12-26-63. I reside at 4521 Pardee, Houston, Texas and my home telephone number is (713) 676-1079.

I am Garcia Glenn White's sister and during his junior high and high school years Glenn struggled with math and English. He came to me to help him and I helped him in the form that I would write out the answers and he would copy them in his own writing as if he had done the homework himself. This went on through both junior high and high school.

I swear this is all true and correct.

_Monica Garrett_
Affiant

_1-28-2009_
Date

_Rodolfo G. Vargas_
Notary for the State of Texas

_1-28-2009_
Date

My commission expires on :

NOTARY PUBLIC
STATE OF TEXAS
RODOLFO J. VARGAS
Notary Public, State of Texas
My Commission Expires
December 30, 2011

# EXHIBIT 4

`I`



**BROWN, NELSON, FRANK & ASSOCIATES**
3555 Timmons · Suite 1010 · Houston, Texas 77027 · 713/871-8952 · Fax 713/871-1059
7702 F.M. 1960 East · Suite 216 · Humble, Texas 77346 · 713/852-3828
714 Main · Liberty, Texas 77575 · 409/336-5899 · Fax 409/336-4098

AFFIDAVIT

State of Texas

COUNTY OF HARRIS

Re:  Garcia Glen White (TDC# 999205)

ON THIS DAY,  THE UNDERSIGNED CAME BEFORE ME AND DID SWEAR TO THE
FOLLOWING:

"My  name  is  Jerome  B.  Brown.   I  have  a Ph.D.  in clinical
psychology and am a licensed psychologist in the state  of Texas.
I am over 18 years old and competent to make this affidavit.

I have  reviewed  as many of  the relevant  treatment records and
investigative materials of Garcia G. White as were provided to me
by his council.   In addition,   I have  conducted two independent
psychological evaluations of this individual at the Ellis Unit of
the Texas Department of Corrections on  May 16th  and August 28th
1998,   including in depth interviews and  psychological testing.
The  information I have  obtained  have  lead  me  to include the
following:

     1.  Mr.  White has a history of significant abuse of cocaine
with accompanying personality changes.   Although he is typically
a passive and easy-going individual,  the effects of this illegal
chemical are dramatic upon him and produce aggressive and violent
urges which he typically would not have  or exhibit.   When he is
not using cocaine he returns to  his normal  or usual personality
state which is usually docile and stable.

     2.  As long  as he does  not utilize street  chemicals,  Mr.
White does  not represent a danger  to  others  or  to society in
general for any future  acts of violence  or significant criminal
activity.

     3.  His adjustment to the prison setting is satisfactory and
he has shown no  signs of  disturbance including  any tendencies
toward violence since his incarceration and especially  since his

---

*Psychological Consultants to Medicine, Law, Business & Education*

Jerome B. Brown, Ph.D.    Dennis Nelson, Ph.D.    Bradley L. Frank, Ph.D.    Suzi C. Phelps, Ph.D.    Melissa K. Giles, Ph.D.

removal from any type of contact with street drugs. He will have no difficulty continuing this adjustment in a satisfactory fashion and should respond positively in a structured environment such as a prison setting. The combination of the structured environment and abstainance from street drugs will allow his typical personality functioning to remain in place and as long as he is his usual self, he will prove to be no management problem for the prison authorities.

I swear the above is true and correct."



Jerome B. Brown, Ph.D.

Subscribed and sworn to before me on this ___16th___ day of
__October__ , __1998__ .

_____
Notary Public for the State of Texas

LAURA FRANK
MY COMMISSION EXPIRES
JULY 22, 2002

# EXHIBIT 5

MILLER:     ALRIGHT GLEN, I GOT SOMETHING HERE I WANT TO READ YOU, AND I WANT YOU TO LISTEN REAL CAREFULLY.

YOU HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL AND THAT ANY STATEMENT YOU MAKE MAY BE USED AGAINST YOU AND PROBABLY WILL BE USED AGAINST YOU AT YOUR TRIAL.

ANY STATEMENT YOU MAKE MAY BE USED AS EVIDENCE AGAINST YOU IN COURT.

YOU HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE YOU PRIOR TO AND DURING ANY QUESTIONING.

IF YOU ARE UNABLE TO EMPLOY A LAWYER, YOU HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO ADVISE YOU PRIOR TO AND DURING ANY QUESTIONING.

AND, YOU HAVE THE RIGHT TO TERMINATE THIS INTERVIEW AT ANY TIME.

NOW GLEN DO YOU UNDERSTAND THOSE RIGHTS THAT I HAVE JUST READ TO YOU?

WHITE:      SIR, THAT'S THE STATEMENT I WAS TELLING YOU ABOUT RIGHT THERE. I HAVE THE RIGHT TO A, ONE...I DEFINITELY HAVE THE RIGHT TO HAVE A LAWYER PRESENT.

MILLER:     THAT'S RIGHT, AND THAT'S THE SAME STATEMENT THAT I READ TO YOU EACH OF THE TIMES THAT WE'VE TALKED. O.K. THERE'S FIVE OF THEM, AND THEY WRITE THEM DOWN ON THIS CARD FOR ME. O.K. WHAT I'M ASKING YOU IS DO YOU UNDERSTAND THOSE RIGHTS?

WHITE:      YES SIR.

MILLER:     O.K. DO YOU AGREE TO WAIVE THOSE RIGHTS AND TELL ME ABOUT THE 1989 KILLING ON WEAVER ROAD?

(PAUSE)

GLEN, DO YOU AGREE TO GIVE UP THOSE RIGHTS AND, AND, AND, TELL ME ABOUT WHAT HAPPENED ON WEAVER ROAD IN 1989?

WHITE:      YES SIR.

1


STATE'S EXHIBIT 56a

MILLER:    O.K. WHAT HAPPENED, WHAT HAPPENED BACK IN 1989 ON WEAVER
           ROAD?  NOW WE TALKED ONCE BEFORE AND YOU TOLD US THAT
           THERE WAS A GUY NAMED GEECHIE NAMED TERRANCE MOORE.  IS
           TERRANCE...

WHITE:     MOORE.  I MADE IT ALL UP.

MILLER:    YOU MADE THE THING ABOUT TERRANCE MOORE UP?

WHITE:     YES SIR.

MILLER:    O.K.  TELL ME, TELL ME WHAT REALLY HAPPENED OVER THERE IN
           1989 ON WEAVER ROAD?

WHITE:     I WAS SMOKING DOPE.

MILLER:    UH HUH.

WHITE:     WITH THE MOM.  UHM SO I JUST, KIND OF LIKE RAN OUT OF
           DOPE AND THINGS JUST WENT WILD.  SHE KINDA LIKE SNAPPED.

MILLER:    O.K. YOU RAN OUT OF DOPE AND, AND, SHE KIND OF SNAPPED?

WHITE:     YEA.

MILLER:    AND WHAT HAPPENED?

WHITE:     SHE REACHED FOR A KNIFE, AND I TOOK THE KNIFE AND STABBED
           HER.

MILLER:    O.K.  HOW MANY TIMES?

WHITE:     I DON'T KNOW SIR.  THAT'S REALLY ALL I KNOW.

MILLER:    A BUNCH, OR JUST ONE OR TWO?

WHITE:     (SHRUGS SHOULDERS INDICATING HE DOESN'T KNOW)

MILLER:    O.K.  WHERE DID SHE GET THE KNIFE FROM?

WHITE:     OUT THE KITCHEN DRAWER.

MILLER:    AND, AND, WHERE WERE Y'ALL AT WHEN YOU STABBED HER?

WHITE:     IN THE DINING ROOM AREA.

MILLER:    O.K.  AFTER YOU STABBED HER DID, DID SHE FIGHT BACK AT
           ALL?

WHITE:     SHE TRIED TO.

MILLER:    AND WHAT HAPPENED?

2

0000 0000 0000 0000

WHITE:      HMMMM.  AFTER I STABBED HER, SHE DIDN'T...JUST LAY...I
            MEAN SHE JUST LAY THERE.  SHE COULDN'T MOVE.

MILLER:     I'M SORRY, WHAT NOW?

WHITE:      AFTER I STABBED HER, SHE KIND OF KICKED AT ME AND LIKE
            ALMOST TRIED TO SCRATCH ME, BUT SHE DIDN'T.

MILLER:     O.K.  AND THEN WHAT HAPPENED?  DID THE GIRLS IN THE BACK
            WAKE UP THEN?

WHITE:      SOME KIDS COME OUT.

MILLER:     DID THEY COME OUT OF THE BEDROOM?

MILLER:     AND WHEN THEY CAME OUT OF THE BEDROOM WHAT HAPPENED.

WHITE:      I WENT INTO THE BEDROOM AFTER THEM.  STAB...I STABBED ONE
            IN THE BEDROOM AND ONE IN THE LIVING ROOM.  THAT'S ALL I
            WANT TO TALK ABOUT.